## In re CYSIVE, INC. SHAREHOLDERS LITIGATION.

### C.A. No. 20341.

Court of Chancery of Delaware, New Castle County.

Submitted Aug. 5, 2003.
Decided Aug. 15, 2003.

---

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington; Jeffrey H. Squire, Kirby McInerney & Squire, L.L.P., New York City; Brian P. Glancy, Hughes Sisk & Glancy, P.A., Wilmington; Stephen D. Oestreich, Entwistle & Cappucci, L.L.P.; Richard B. Brualdi, the Brualdi Law Firm; and Joseph McBride, Rabin Murray & Frank, L.L.P., New York City, for Plaintiff.

Lawrence Ashby, Philip Trainer, Jr., and Carolyn S. Hake, Ashby & Geddes, Wilmington; Robert R. Vieth, Michael J. Klisch, and Daniel J. Wadley, Cooley Godward, L.L.P., Reston, VA, for Defendants Snowbird Holdings, Inc., Nelson A. Carbonell, Jr., and John R. Lund.

Donald J. Wolfe, Jr., Arthur L. Dent, Brian C. Ralston, and John M. Seaman, Potter Anderson & Corroon, L.L.P., Wilmington, for Defendants Daniel F. Gillis, Kenneth H. Holec and Jonathan S. Korin.

## OPINION

STRINE, Vice Chancellor:

This post-trial opinion addresses stockholder-plaintiffs' challenge to a management buy-out proposed by defendant Nelson Carbonell, the Chairman, Chief Executive Officer, director, and largest stockholder of Cysive, Inc., a small capitalization technology company whose shares trade on the NASDAQ.

After going public and enjoying some early success as a provider of technology consulting and software applications services, Cysive's business suffered in the decline in the technology market that occurred at the beginning of the new century. To address that problem, Cysive sought to transform itself into a products company, by marketing a software product it had engineered. Because Cysive had raised a healthy amount of capital in its initial and secondary public offerings, it had the cash to pay its bills while trying to undertake this transformation.

Nevertheless, by the autumn of 2002, Cysive's board of directors was becoming restive about whether the company would be able to sell its product and become profitable. With the support of the full

board — which included three outside directors along with Carbonell and his subordinate and ally, John R. Lund, the company's Chief Financial Officer — a respected investment bank was retained to try to find a buyer for the company. Carbonell and Lund were enthusiastic supporters of this initiative and worked in good faith to help locate a strategic transaction to maximize stockholder value.

After this process had gone on for several months, Carbonell decided to make his own offer. A special committee of independent directors was formed. Serious negotiations ensued that ultimately resulted in an agreement with Carbonell on more desirable terms for Cysive's public stockholders — $3.22 per Cysive share — than he had originally proposed. As important, those terms permitted the special committee to continue to discuss a sale with other buyers, subject only to the payment of a reasonable termination fee if the special committee decided to pursue another deal. After signing a merger agreement with Carbonell's acquisition vehicle, the special committee in fact talked with several potential buyers but, to date, no more valuable transaction has materialized.

Because the pendency of this suit was hampering Carbonell's financing efforts, the defendants sought an expedited trial. That request was granted and trial has now been held on plaintiffs' claims.

This opinion resolves those claims against the plaintiffs. As a preliminary matter, I find that Carbonell is a controlling stockholder and that the transaction is therefore subject to the entire fairness standard under the teaching of *Kahn v. Lynch Communication Systems, Inc.*[1] and its progeny. Nevertheless, the defen-

dants have convinced me that the transaction meets that exacting standard. Among the factors that support that conclusion are: (1) the diligent efforts of the special committee, which acted as an effective proxy for arms-length bargaining; (2) the absence of any bad faith conduct by Carbonell and his willingness to permit the special committee to do its job without pressure from him; (3) the extensive market check that preceded and followed the signing of the merger agreement, which is material evidence of the fairness of the deal price; and (4) the premium that the deal price represents to the pre-affected market trading price of Cysive shares and to the company's liquidation value. As an incidental matter, I also conclude that the special committee process was effective enough to warrant the burden shift contemplated in Lynch, but that the defendants prevail regardless of whether they bear the ultimate burden to show fairness.

In so holding, I also address a mistake in judgment by Lund, who failed to provide the special committee's advisors with a document that was within the scope of their information requests. This was an unfortunate event. But a searching examination of that event in the full context of the negotiation and sales process demonstrates that the error in judgment did not have any adverse effect on the outcome of the merger negotiations or the sales process. Nor, I conclude, was the mistake motivated by any improper purpose. Thus, as is more fully explained later, I find that the merger is fair, notwithstanding Lund's error.

### I. *Factual Background*

#### A. *The Origins of Cysive*

---

**1.** 638 A.2d 1110 (Del.1994).

Cysive originated in 1993.[2] Defendant Nelson A. Carbonell, Jr. founded the company. In its initial stages, the company operated on a shoestring out of Carbonell's house. The company provided software technology and development services, such as customizing software and providing service solutions to clients. Although the record is sketchy, it appears that the company focused on providing its brainpower to other companies looking to solve particular technology problems, for which the company received payment on a project-by-project or hourly basis.

Carbonell was able to develop Cysive to the point where it had customers and a pool of talented employees. To aid him in managing the finances of the business, Carbonell brought in John R. Lund on a full-time basis. Lund had previously provided services on a consulting basis to Cysive as an executive at PRC, Inc., where he had first met Carbonell. Eventually, Lund became Cysive's Chief Financial Officer and a director.

### B. Cysive Goes Public and Its Stock Price Soars

Cysive had a good enough business model to share in the technology boom of the late 1990s, going public on the NASDAQ in 1999 at a per share price of between $15 and $20, only to see its stock price soar to $120 per share. All this occurred before Cysive had demonstrated any ability to operate profitably. In 2000, the company made a secondary public offering at $87 per share. Carbonell sold stock comprising 5% of Cysive's equity and reaped profits of over $62 million. Lund also reaped a healthy return, yielding approximately $6 million on the sale of his stock. In the initial and secondary offerings, Cysive raised nearly $170 million in cash to invest in developing its business.

Even after his sales in the secondary offering, Carbonell held approximately 35% of the stock of the company, without considering options he also held, which could be converted into another 0.5% to 1%. Meanwhile, Lund held less than 1% of the company's shares before options, and another 3% to 4% after options. In addition, Carbonell employed two of his family members at Cysive, his brother and brother-in-law, who in time came to own half a percent of Cysive before options when their ownership is combined. As a result, Carbonell and his close managerial-subordinate and family member-subordinates controlled 36% of the Cysive shares before options. When considering options, this group – taken together – controlled about 40% of the voting equity. The plaintiffs contend that the figure is just short of 44%. I find it to be a bit lower.

### C. The Tech Boom Ends and Cysive Changes Strategic Direction

Soon thereafter, however, the good times ceased to roll for Cysive. When the technology market started to dip in the post-Y2k era, Cysive's consulting business started to become untenable. Whereas Cysive was previously able to bill out its programming and other services at favorable rates, declining market demand and increased competition drove down the prices the company could charge to levels that were not consistent with the eventual attainment of profitability.

Therefore, Carbonell decided that the company needed to change its focus if it was to become successful. Rather than concentrate on providing its programming expertise to others as the means to generate a return, Cysive would instead attempt to develop software products and sell them, along with the support services nec-

---

2. The company started under another name.

essary to make the products function for customers. In particular, Carbonell wanted Cysive to exploit the potential of a product that the company had developed, the Cymbio Interaction Server ("Cymbio"). Described simplistically, Cymbio was designed to provide a customer (*e.g.*, a bank) with an easy way for its employees and customers to use the full array of its technology options from various remote gateways (*e.g.*, automatic teller machines, laptops, cellphones, personal digital assistants, *etc.*). Thus, Cymbio would allow a bank executive to access all of the technology functions that would be available at her desktop from her "blackberry." At least, that is the layman's sense that emerged at trial.

In any event, Carbonell committed Cysive to this course. To aid the company in this transformation from a services company to a product company, Carbonell added independent directors to Cysive's board. As of 2001, Cysive's board already included Jonathan S. Korin. Like Carbonell, Korin was a former employee of PRC and got to know Carbonell there. During the time period relevant to this case, Korin has been employed as a senior executive at Northrop–Grumman Corporation, where he specializes in, among other things, mergers and acquisitions. He has a great deal of experience in the systems engineering business, an aspect of the overall technology market. His compensation as a Cysive director — now some $12,000 per year, plus $1,000 per meeting, and certain stock options — is not a material portion of his annual income or of his net wealth. He is neither a close friend of Carbonell nor beholden to him.

Two other independent directors — Daniel F. Gillis and Kenneth H. Holec — joined Korin on the board in 2001. The search firm of Heidrick & Struggles identified Gillis and Holec as candidates who could help Cysive in its transition from a services company to a product company. Neither Gillis nor Holec knew Carbonell before joining the Cysive board. Each brought to the board deep experience in the software industry. Both have been successful enough so that the compensation that they receive as Cysive directors is not a material part of their annual incomes or net worth. Neither is a close personal friend of, nor beholden to, Carbonell.

### D. *The Company Begins to Execute Its New Strategy*

As of early 2001, Cysive was poised to move into the products business without any immediate financial stress. Although the company had a payroll to meet and other obligations (*e.g.*, leases) that caused it to have a cash "burn" rate of over $1 million a month, the company's coffers were filled with cash from the initial and secondary offerings. That said, the company was also quite modestly sized and looking to sell so-called "middleware" — software that was designed to help other software that had the larger task of helping businesses run all their technology (so-called "enterprise" software) function more effectively. This "middleware" market is, the evidence convinces me, a tough market to crack for a small company like Cysive and was a market particularly affected by the technology slump. In a period when all aspects of technology budgets at companies were coming under scrutiny, procurement executives were less likely to add middleware, which could be viewed as merely a nice add-on, not worth the expense at a time when bottom-line margins were shrinking.

The practical problems of cracking this market were compounded by a drop in the company's stock price. When the market's infatuation with technology stocks ended, Cysive's formerly lofty stock price

dropped precipitously. From its NAS-DAQ trading high of $63 per share in March 2000, Cysive's stock price dropped drastically, eventually reaching a low of $1.93 per share in August 2001.

To that end, Carbonell and his sales staff made repeated contacts with potential buyers. They worked the relevant executives at companies that might have an interest in using Cymbio. But while they received a respectful hearing and some expressions of interest, actual sales did not result.

The company's transformation to a products company complicated its financial planning process. When the company had been primarily a services company, Lund — as CFO — had been able to predict with some degree of reliability what revenues were anticipated to be. He could assume that the company's service providers would work a certain number of hours at particular rates, and project revenues could be determined from that method. When the company's focus shifted to selling Cymbio, Lund's ability to predict the company's revenues was compromised. At best, Lund and Carbonell could work with the company's sales staff to formulate a prediction of what sales might come to pass and their likelihood. Because this was, at best, a careful exercise in guesswork, Cysive stopped providing the market with any revenue guidance in early 2001 after changing its focus.

Although the company continued to develop internal revenue estimates, these were really goals and hopes. Management's bonus compensation was tied to them, which resulted in the non-receipt of bonuses by Carbonell and Lund during the last two years. The plan was to get a couple of key sales of Cymbio to respected public companies. Once Cysive was able to do so, and to show that its product was good enough for these reputable compa-

nies to purchase and use, Cysive expected that other companies would become more comfortable buying the product and that consumer demand could escalate at a healthy rate.

E. *The Board Decides to Seek a Strategic Transaction in Order to Maximize Shareholder Value*

It was in this general technology market context that Cysive embarked upon its transformation. To facilitate the acceptance of Cymbio and its eventual sale, Cysive gave clients with whom it had existing service deals access to Cymbio on a favorable basis as part of its services agreement. Cysive was able to use this method to "prove the Cymbio concept," but this did not generate revenues for the company. By this method, Cysive did convince itself that Cymbio worked and updated the product to make it work even better. It also began to attempt to sell the product to customers at a price that would yield substantial revenues.

By the early part of 2002, Cysive's board was becoming restive. Product sales of Cymbio had not materialized. The outside directors — Korin, Holec, and Gillis — wanted to give management the chance to make the transition to a product company succeed, but they also wanted to make sure that the company did not simply run down its remaining cash in a fruitless effort. Rather, to the extent that sales of Cymbio did not come to pass in a reasonable period of time, the outside directors were committed to exploring a major transaction — such as a sale of the business or liquidation — in order to return some value to the stockholders.

By October of 2002, the company had still not attained any commercial sales of Cymbio. Although the record is not undisputed, I find that by this time frame, the entire Cysive board was persuaded that it was necessary for the company to consider

the possibility of a sale of the company or a strategic alliance. The plaintiffs contend that the initiative came purely from Carbonell. I find that the outside directors had reached the same conclusion and had informed management that it was time to take immediate steps to preserve stockholder value, in a context in which the monthly burn rate exceeded $1 million and management's hoped-for sales were not materializing.

At an October 21, 2002 board meeting, Carbonell and Lund presented a variety of options to the board, which included staying the course, seeking a buyer or strategic advisor, or liquidation. The board determined that it should engage professional advisors to help it find a buyer, as such a transaction could result in a recognition of the value of Cymbio, whereas a liquidation was unlikely to yield as high a price. That option also promised the additional benefit that it could possibly result in continued employment for some of the Cysive employees most involved with the development of Cymbio. Meanwhile, Cysive's management was to continue to market Cymbio vigorously.

In November 2002, the Cysive board heard presentations from two potential financial advisors. The board ultimately selected Broadview International LLC, a firm that specialized in the technology industry.[3]

F. *Broadview Works with Company Management to Try to Find a Strategic Buyer*

The sales process began in earnest in the early part of 2003. That process was not made public. Rather, the board chose to proceed more discreetly, by having Broadview solicit strategic buyers who would have a logical interest in Cymbio. This decision made sense, as a public announcement might have scared Cysive's workforce, creating a drain of quality employees that could hurt the sales process. Moreover, because Broadview and the board had a deep knowledge of the technology market, they were able to identify a large universe of potential partners to solicit directly. There is no reasonable basis to quibble with this choice in approach.

Likewise, contrary to the plaintiffs' insinuation, I find that Carbonell and Lund were enthusiastic supporters of the effort to find a buyer or strategic partner for Cysive. Carbonell, in particular, was high on Cymbio and felt that it was valuable, and that a good deal could be had once Broadview and company management marketed the company.

To carry out its task of finding a valuable strategic option, Broadview sought information from Cysive about Cymbio, including expected sales figures for that product. It met with Carbonell and Lund and discussed the key prospective buyers they were focused upon, which included Federal Express, J.P. Morgan, and General Motors. At that time, the company hoped to close sales with those companies early in 2003.

Cysive also provided Broadview with a December 2002 budget for calendar year 2003. That budget included highly opti-

---

**3.** Broadview presented a preliminary liquidation value of Cysive of $3.37, which was prepared solely from publicly available information. That figure exceeds the deal price at issue here and, as will be discussed, the liquidation value later estimated by the special committee's advisor, CBIZ Valuation Group, Inc. I believe that the figure presented at the initial meeting by Broadview is of little significance given the expenditure of cash between autumn 2002 and the approval of the merger in May 2003 and because the preliminary figure presented by Broadview was a rough, early cut, and not the product of a full analysis.

mistic goals for revenue of $15.9 million, based on the assumption that $30 million of Cymbio deals would close at an average value of $900,000 each.[4] Importantly, revenues were to lag sales by several months. Therefore, the goal was for most of the revenue to come in during the latter half of 2003, but that nearly $9 million of deals would be signed up by the end of March 2003, and $19 million by mid-June 2003.[5] Even if the company met these optimistic goals, a net loss of nearly $9 million was expected for the year, albeit with the bright spot of running in the black for the last several months of the year.

Broadview cautioned Cysive that it would be counterproductive to share with prospective buyers revenue estimates that were not reliable. If Cysive presented buyers with numbers that it ended up missing by a long shot, then potential buyers would likely be scared off and Cysive's sales efforts would lose credibility. Therefore, Broadview did not share the $15.9 million revenue goal, as it was informed that this goal was unlikely to be achieved. Soon after receiving the $15.9 revenue figure, Lund produced a revised revenue assumption in early January 2003, which was also shared with Broadview. This revision took the revenue figure down by nearly $10 million, to $6 million for the full year (the "January Budget"). Projected sales for the calendar year also dropped, by $12 million.

Lund did not want this information to be shared with prospective buyers, as he lacked confidence that the company would make revenues near even the lower figure in the January Budget. That figure was not based on any historic record of Cymbio sales because there weren't any. Rather, the January Budget was the result of meetings with sales staff who produced

reports about prospective sales, none of which yet involved a signed agreement of any kind.

Using information it had obtained from Cysive management and Cysive's public filings, Broadview developed a brief executive summary containing information about the company for use with potential buyers. It then began contacting a wide variety of industry players who would have a logical interest in Cymbio and, thus, in purchasing Cysive. Broadview's technique was to make a phone call to a key executive and then to follow up with an e-mail containing the summary. It was made clear to potential buyers that non-public information would be made available if a prospective buyer signed a non-disclosure agreement. This approach accords with the expected practice of public companies and does not, as the plaintiffs contend, constitute a flaw in the sales process. Any serious buyer would eventually want non-public information. A serious seller, however, would not send such information to the world in the first instance, but would instead do as Broadview did and indicate a willingness to provide such information after an appropriate confidentiality agreement was executed.

Carbonell also fed names to Broadview and made contacts himself to aid in the sales process. I find that he did so in a good faith effort to procure a favorable transaction. Given his stockholdings, Carbonell had a large incentive to try to land a high bid. So did Lund. Although it is true that Carbonell and Lund were virtually the only link Broadview had to the board on a weekly basis during the early part of 2003, that is not a disturbing fact because both men were working diligently to help Broadview find a buyer. Nothing in the

---

4. JX 9.

5. *Id.*

record suggests that Carbonell or Lund were searching for a buyer who would take care of their personal needs, much less trying to sabotage the sales process. Rather, the evidence persuades me that they were faithfully following the board's mandate to develop a strategic option that would maximize shareholder value. To that end, Carbonell in particular attempted to persuade potential buyers both of the company, and of Cymbio as a product, of the value of the Cymbio technology.

### G. *The Sales Process Does Not Go Well*

To the board's disappointment, it became apparent by early March that the effort to find a buyer had not yielded a bevy of anxious buyers. To the contrary, despite the fact that Broadview contacted a large number of logical buyers, none had expressed serious interest and none had asked for non-public information. This is not, I conclude, because either Broadview or company management did not market the company skillfully, it was because Cysive was trying to sell itself in a difficult environment, in which useful technology products were abundant and the demand for them was dampened.

At a March 11, 2003 board meeting, Broadview reported on the state of the sales effort. Because of the lack of success to that point, Broadview raised the possibility of exploring a management buy-out or liquidation, while continuing to market the company. The board did not take any immediate action in either direction, and Broadview continued its sales efforts. During the same time period, Broadview and the board also learned that the company had not landed any sales of the Cymbio

product in the year to date and that none were likely in the near term. This undermined any residual weight Broadview had given to the earlier revenue goals that Lund had shared with it.

### H. *In the Absence of Another Buyer, Carbonell Decides to Propose a Management Buy–Out*

At this stage, Carbonell began to become concerned that Cysive would not find a buyer. Having built Cysive and believing that Cymbio was a useful product that could achieve market success, Carbonell therefore decided to make an offer himself to purchase the shares of Cysive that he did not already own.[6] The benefits of such a transaction from Carbonell's perspective were several, and included:

- The opportunity to exploit a technology that he had played a key role in creating and that he believed to be of real utility;
- The chance to keep Cysive's employees together and working;
- The avoidance of liquidating the company, an eventuality that Carbonell found personally distasteful and somewhat embarrassing;
- The ability to cut Cysive's burn rate by reducing the expenditures flowing from Cysive's status as a public company, as this would give the company more time to market Cymbio; and
- The implementation of a transaction that would provide Cysive's public stockholders with a premium over market prices and the liquidation value of the company.

6. The plaintiffs have suggested that Carbonell had a management buy-out, or "MBO," in mind from the beginning. I conclude differently. While he and the rest of the board realized that an MBO was a possible option, it was not their first option. Had Carbonell seen a nicely-priced third-party bid, I am persuaded he would have been receptive to it. He had both an economic incentive to do so and a less material interest in seeing the Cymbio technology be put to commercial use.

On April 24, 2003, Carbonell wrote to Gillis, Holec, and Koren stating:

The purpose of this letter is to inform you of my interest in submitting a proposal on behalf of management to acquire Cysive, Inc. (the "Company"). It is my current intention to form a company with certain members of senior management of the Company, including John Lund, and possibly other investors, to pursue an acquisition of the company. It is my understanding that you will establish a special committee of the Board consisting of one or more independent outside directors, and that the special committee will engage its own financial advisor and counsel. Once a special committee has been established, and an appropriate confidentiality agreement is in place, I anticipate submitting a formal proposal describing in detail the structure, pricing, financing and other material provisions of the proposed transaction. Please note that, to date, the only members of management who have knowledge of this intention to submit an acquisition proposal are John Lund and myself.

I believe it is in the Company's best interests that my interest in pursuing a potential transaction be kept strictly confidential pending the execution of definitive agreements and trust that you would agree. Additionally, it is our desire to commence negotiations immediately with a view to reaching mutually satisfactory executed definitive documents concerning the potential transaction, if possible, prior to the annual shareholders' meeting of the Company on May 14, 2003.[7]

The letter makes certain points that bear emphasis. First, Carbonell clearly signaled his desire to keep Lund in management with him if his bid succeeded and his desire to have Lund help him formulate his bid. As things panned out, Carbonell never formally asked Lund to invest in an MBO group but Lund did, at all times, occupy a position of trust and confidence on Carbonell's team, helping him find financing and acting as a confidant.

Second, Carbonell acknowledged from the beginning the need to deal at arm's length with a special committee of independent directors. The record suggests that although he sought to pursue his own economic interests, he did so mindful of the interests of Cysive's stockholders, his fiduciary duties, and the need to be above-board with the special committee.

Third, Carbonell desired to keep the discussion of his offer quiet around the company. This was for the same reasons that the Broadview sales process had been kept private: he did not believe that it would help the stockholders if employees began to depart or become distracted because of the uncertain future of the company. Until a firm deal was reached, Carbonell wanted to focus the employees on their task of helping to obtain sales of Cymbio. This desire was legitimate and was shared by the board.

Finally, Carbonell wanted to move fast. He wanted to go into the company's annual meeting with an announcement. This would ameliorate stockholder sentiment about the decline in the company's stock price.

## I. The Special Committee is Formed and Retains Advisors

The next day, April 25, 2003, the board met and formed a special committee comprised of directors Gillis and Holec. The committee was charged with evaluating Carbonell's MBO proposal and otherwise

7. JX 40.

conducting the sale process for the company. Director Korin was excluded from the committee because he expressed interest in possibly remaining as a director of the company if it was taken private by Carbonell. Although neither Gillis nor Holec believed that this compromised Korin's ability to serve impartially and effectively on the committee, the board decided to opt for the most pristine approach and excluded him.

For its financial advisor, the special committee decided to retain Broadview. Given Broadview's work in the sales process and knowledge of the company, the special committee believed it was best situated to help the special committee. Because Broadview had been originally retained by the full board to represent Cysive as an entity, the special committee did not see any conflict in having Broadview now represent it in negotiations with Carbonell. In the special committee's view, it was Carbonell (and Lund) who now had a conflict, and not Broadview. Moreover, Broadview had no other relations with Carbonell that could compromise its judgment.

The retention agreement for Broadview provided it with an incentive to obtain a higher price in a sale of the company to a third-party or to Carbonell. This incentive, however, had one feature that was deemed by the committee to be problematic. All things being equal, Broadview had an incentive to prefer a sale over a liquidation of the company because its fee agreement provided it with additional payments for a sale that were not available in the event of a liquidation. For that reason, the special committee eventually decided, with Broadview's support, to retain

an additional advisor, CBIZ Valuation Group, Inc. ("CBIZ"), to perform a liquidation valuation for the company. This liquidation valuation would assist the special committee in evaluating that strategic option and would be used as a benchmark to measure bids by Carbonell and other potential buyers. No credible evidence exists that the incentive of Broadview to prefer a sale to a liquidation in any manner generated unfairness, and I do not discuss this factor further.[8]

For its legal counsel, the special committee selected Potter Anderson & Corroon LLP. The independence of that firm has gone unquestioned by the plaintiffs.

### J. Carbonell—through Snowbird—Makes an Offer

On April 30, 2003, Carbonell presented a draft term sheet to the special committee on behalf of his acquisition vehicle, Snowbird Holdings, Inc. Snowbird offered to pay $3.01 per share for all Cysive shares, a price Carbonell set because he believed it exceeded a preliminary estimate of Cysive's liquidation value by fifteen cents per share.[9] On the heels of the term sheet, Snowbird sent a draft merger agreement containing a $4 million termination fee and strict no-shop provisions. The Snowbird offer purported to expire on May 12, 2003.

The Snowbird offer was made public. This stimulated interest from some additional parties, with whom the special committee and Broadview engaged promptly. These included financial buyers such as Platinum Equity, with whom the committee negotiated at the same time it was speaking with Snowbird. Other third parties signed non-disclosure agreements and

---

8. The evidence suggests that Broadview acted properly and that the special committee would have suggested liquidation if that was the best option for stockholders.

9. See Tr. 187–88.

received confidential information but eventually never made a bid.

### K. *Summary of the Negotiations*

Between the time of the original Snowbird offer and the time a deal with Snowbird was eventually struck, numerous special committee meetings were held and multiple versions of an agreement were exchanged. During that process, the special committee used the potential interest of Platinum Equity to encourage Snowbird to increase its bid.[10]

In early May, Snowbird increased its bid to $3.05. The special committee let that increased bid expire by its own terms on May 12, choosing to risk losing that bid rather than act prematurely. In doing so, it resisted Carbonell's desire to conclude an agreement before the annual meeting. The special committee then encouraged Snowbird to make an offer of at least $3.20 per share, a price which exceeded the special committee's working estimate of liquidation value. Snowbird did so. When the special committee's view of liquidation value changed a bit, it used that development to extract another two cents per share from Snowbird.

Simultaneously, the special committee negotiated with Snowbird about the deal protection aspects of the proposed merger agreement. The special committee chipped away at Snowbird, reducing the termination fee from $4 million to a maximum of $1.65 million including expenses. In the event that Snowbird failed to waive its financing contingency, it was limited to an expense reimbursement only.

The special committee refused to agree to a no-shop provision. The final terms of the agreement provided Snowbird with the right to match any superior offer within forty-eight hours, but contained no barrier to special committee discussions with third parties. The only penalty for termination was the payment of the termination fee itself.

The record reveals that the negotiations that led to these terms were vigorous and frustrated Carbonell. Carbonell's personal view was that the liquidation value of the company was lower than the special committee estimated and that he was paying a large premium to the real liquidation value. He also felt like he lost every discussion of the deal protection provisions. Although I am not convinced that the negotiations were a death struggle, I am persuaded that they were genuinely adversarial, spirited, and conducted in good faith by the special committee on behalf of the public stockholders of Cysive.

### L. *The Financial Analyses Presented to the Special Committee*

As noted, the special committee had engaged CBIZ to provide a liquidation valuation for its use. Meanwhile, Broadview was preparing a broader fairness analysis that would include the CBIZ liquidation value as one factor but would also examine other indicators of value.

During this process, both Broadview and CBIZ naturally sought any estimates of company revenues that management possessed. For CBIZ's part, these estimates were designed to see what, if any, value could be placed on Cymbio in the event of liquidation. For Broadview, the information had multiple purposes, most prominently to permit it to value Cysive as a going concern and, as previously discussed,

---

10. Platinum Equity at one point dangled a price of $3.11 per share before the special committee but ultimately backed away from that level and lowered its bid price after due diligence. During negotiations with Snowbird, the special committee also diligently followed up on expressions of interest from other third parties.

to help it in marketing the company to buyers.

At this juncture, Lund did something that came to become a major feature of this case. In May 2003, he was asked by Broadview if he could vouch for certain revenue estimates for Cysive made by an analyst from Thomas Weisel Partners or provide Broadview with estimates of his own. During the same period, Lund had also received information requests from the special committee to help CBIZ in its work. These requests sought budget and revenue information on a current and forward-looking basis.

In this general time period, Lund had updated the budget document that he uses to track the company's expenditures and that contained the company's revenue goals. He did this as of April 10, 2003 (the "April Budget").[11] The revenue revision, when closely examined, simply alters the previous estimate of $6 million for calendar year 2003 downwards to $4.48 million, based on the absence of any of the sales that had been projected for the first three months of the year. At trial, Lund testified that he did not provide the revised revenue numbers in the April Budget to either Broadview or CBIZ because they were not reliable.

Lund's failure to provide the April Budget was, to use measured words, unwise and improper. His duty as a director and CFO was provide the special committee and its advisors with all the information they asked for, because they were entitled to all the information the company had. If Lund felt that the new numbers were un-reliable, he should have provided them with an explanation of exactly what they were and a disclaimer.

That said, a close look at all the facts and circumstances convinces me that Lund's failure did not impair the functioning of the special committee or its advisors. After all, Broadview had the prior revenue goals for calendar year 2003 in the January Budget — which were higher. And the facts on the ground were that Cymbio had yet to be sold and that Lund, I find, honestly believed that he could not forecast when any sales would occur. Broadview and the special committee regularly asked about the sales pipeline and were accurately informed of the prospects for sales, which was that no one could predict with any reliability when a sale would actually take place. And, of course, no sale had yet taken place despite the efforts of Carbonell and a sales team motivated by economic incentives to land buyers for Cymbio.

Thus, although it is undoubtedly the case that it would have been consequential had Lund denied the special committee access to a reliable revenue projection, the fact is that no such reliable projection existed. Although Lund acted improperly by withholding his downward revision of the year's revenues in the April Budget, he did not deprive the special committee or its advisors of material information. As important, any downward revision he would have given to them would not have made the special committee advisors more optimistic about the value of Cymbio, it would have made them less so.[12]

11. JX 14.

12. The plaintiffs contend that Lund vouched for the revenue figures in the April Budget by providing them to a bank that Carbonell hoped would provide Snowbird with financing. A close review of the document in question, an inter-office memorandum from Branch Banking and Trust Company ("BB & T"), JX 139, reveals otherwise as that document refers only to the reduction in burn rate that could be achieved if Cysive went private. Indeed, that document emphasizes the bank's need to focus on the burn rate in making its lending decision precisely because there were

In view of the absence of Cymbio sales and the tepid reaction of strategic buyers for Cysive, the Cymbio technology was given little weight by the special committee or its financial advisors. CBIZ formally opined that the liquidation value of Cysive was $3.16 per share as of May 29, 2003, giving no value to Cymbio in that calculus.[13] Broadview prepared a host of valuation exercises that were largely hypothetical, given the lack of sales or demonstrated demand for Cymbio. It concluded, based on the liquidation value and its understanding of the market's assessment of the company's value and Cymbio's value, that a deal at $3.22 per share was fair from a financial standpoint to Cysive's public stockholders.

### M. *The Special Committee Recommends and the Board Approves the Snowbird Merger*

On May 29, 2003, the special committee met twice. At the meetings, the special committee formally received CBIZ's liquidation valuation of $3.16 per share. Broadview also reviewed the draft analyses that it had developed in concert with preparing to render a fairness opinion and advised the committee that the merger was fair from a financial standpoint. The special committee also reviewed the terms of the merger agreement (the "Snowbird Agreement"), including a feature requiring Carbonell to vote for the merger unless the special committee determined that the merger was no longer advisable. Thereafter, the special committee voted to recommend the merger to the full board.

The next day, the full Cysive board met. The board heard a report from the special committee and Broadview. It then voted three to zero to approve the merger, with Carbonell and Lund abstaining. The Snowbird Agreement was executed soon after the meeting and was publicly announced.

As of the time the board approved the Snowbird Agreement, Cysive had contacted twenty-five potential strategic buyers and twelve potential financial buyers — or thirty-seven potential buyers in all. No potential bidders had been turned away, all were aggressively pursued. None had made a bid approaching the Snowbird offer. Nonetheless, the Snowbird Agreement gave the special committee the right to continue to entertain offers.

### N. *Litigation Ensues*

After the announcement of the Snowbird Agreement, various suits were filed challenging that proposed transaction. The suits in this court were consolidated, with counsel for Chapman Capital LLC, named as lead counsel.

The plaintiffs made no motion for expedition, but the pendency of the litigation was hampering Snowbird's ability to obtain financing. Therefore, the defendants sought an expedited trial seeking a declaratory judgment that their actions to date met appropriate fiduciary standards of conduct and that the plaintiffs' request for an injunction of the Snowbird deal should be denied. The defendants' request for an expedited trial was granted by the court.

Before trial, a class was certified. Chapman Capital was not named as a class representative, as its leader, Robert Chapman, lost interest in the litigation after being required to sit for his deposition and after recognizing some of the facts that he

---

no certain revenues. Because of this and because no testimony from anyone at the bank was presented, Lund's version of events strikes me as credible, and I conclude that he

did not vouch for the revenues contained in the April Budget to anyone.

**13.** JX 73.

had not known at the time his counsel filed his complaint. In his deposition, Chapman noted that he did not know when he filed his complaint that Cysive had contacted nearly forty prospective buyers other than Snowbird.

### O. The Sales Process Continues After Execution of the Snowbird Agreement

After the Snowbird Agreement was signed, the special committee continued to entertain inquiries from interested buyers and to seek diligently a higher price. As of the time of trial, the committee was still engaged in that process but had yet to find a buyer willing to make a superior offer to the price offered by Snowbird. No record evidence suggests that either Carbonell or Lund impeded these efforts in any questionable manner.[14]

### P. The Diligence of the Special Committee

Throughout the months before and after approval of the Snowbird merger, the special committee met twenty-one times. Although these meetings were telephonic, the record is clear that Holec and Gillis expended a great deal of personal time and energy performing their duties. With the aid of their financial and legal advisors, the special committee members undertook a process that was thorough and reasonably designed to obtain the best deal for Cysive's public stockholders.

### II. Legal Analysis

The key question for resolution in this opinion is whether the Snowbird Agreement should be enjoined because it is the product of conduct that did not conform to expected standards of fiduciary behavior.

The plaintiffs contend that the Snowbird Agreement was negotiated and approved in a procedurally unfair manner and that it is financially unfair. Because Carbonell is a controlling stockholder, the plaintiffs argue, the entire fairness standard applies, in keeping with the Supreme Court's teachings in *Kahn v. Lynch Communication Systems, Inc.*[15] and its progeny. Due to the deficiencies the plaintiffs contend existed in the special committee's operation, the plaintiffs argue that the defendants bear the ultimate burden to prove unfairness.

The plaintiffs argue that the defendants cannot meet that burden because the merger price is too low, being based on a liquidation value that supposedly undervalues Cymbio. The plaintiffs further contend that the sales process is no real evidence of Cysive's value because the special committee and Broadview did not market the company effectively. In addition, the plaintiffs assert that Cymbio must have value or Carbonell would not be paying a premium to liquidation value. For all these reasons, the plaintiffs say that the Snowbird Agreement is unfair and should be enjoined.[16]

---

**14.** By concluding so, I do not mean to imply that Carbonell had indicated that he would sell his stock simply because a bidder made an offer of $3.23 per share. Rather, I mean that Carbonell allowed the committee to do its job and that I see no basis to believe that Carbonell does not remain open to a sale to a third party on the right terms. As I found earlier, Carbonell was an enthusiastic seeker of a buyer early in the sales process and, although in a buying position currently, has engaged in no conduct indicative of bad faith.

Moreover, as a stockholder, he retains the right not to sell his shares. *Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del. 1987).

**15.** 638 A.2d 1110 (Del.1994).

**16.** In the alternative, the plaintiffs argue that the *Revlon* doctrine applies and that the directors breached their fiduciary duties by failing to undertake reasonable efforts to obtain the highest obtainable value. *See Revlon, Inc.*

By contrast, the defendants argue that the Snowbird Agreement is subject to the business judgment rule standard of review. They base that argument on their contention that Carbonell is not a controlling stockholder for purposes of the special standard of review set forth in *Lynch.* Because, the defendants assert, three of the Cysive board members were independent of Carbonell, the presence of an independent board majority suffices to invoke the business judgment standard of review. Additionally, because the Cysive board deferred to the recommendations of an independent committee, another justification for business judgment rule review exists.

Under that standard, the plaintiffs can succeed only if they show that the independent board majority or committee approval was somehow obtained by fraud or coercion on the part of Carbonell or Lund, or that the independent directors violated their duty of care or acted in bad faith. Because there is no evidence of any misconduct of this kind in the record, the defendants contend that the Snowbird Agreement should not be enjoined and that they are entitled to a declaratory judgment in their favor on the plaintiffs' claims for breach of fiduciary duty.

In the alternative, the defendants argue that if *Lynch* does apply, then the burden of ultimate persuasion as to the issue of fairness rests on the plaintiffs due to the effectiveness of the special committee. In any event, the defendants argue that they must prevail because the Snowbird Agreement resulted from arms-length bargaining, has been subject to an aggressive pre- and post-signing market check, and results in a premium to the company's liquidation value and pre-announcement trading price.

*v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182–84 (Del.1986). On that alter-

I now decide which of these positions is, in my view, correct. The first order of business in doing so requires me to determine the standard of review that applies to my examination of the Snowbird Agreement. I turn to that task now. After resolving that question, I then apply the selected standard to explain my result.

### A. What is the Appropriate Standard of Review?

This case brings to the fore an aspect of our corporation law that is passing strange. Although the trial in this matter has already been held, a major aspect of the parties' post-trial briefs focuses on the standard of review I am to apply to decide this case. Why? Because our law has so entangled the standard of review determination with the ultimate decision on the merits that the two inquiries are inseparable.

For their part, the plaintiffs argue that the standard of review is entire fairness. Because, they contend, Carbonell has the attributes of a controlling stockholder, the merger between his acquisition vehicle, Snowbird, and Cysive is subject to the standard of review articulated in *Lynch.* Under that standard of review — the "*Lynch* doctrine," a merger between a controlling stockholder and the controlled corporation is subject to the entire fairness standard of review.

If the *Lynch* doctrine applies, the entire fairness standard may never be wholly obviated. Even if the controlling stockholder has elected a board comprised of a majority of independent directors, which has negotiated and approved the merger terms, the entire fairness standard continues to apply.[17] That is also the case

native basis, the plaintiffs also contend that an injunction is warranted.

**17.** *See Emerald Partners v. Berlin,* 787 A.2d

even if the merger involving a controlling stockholder has been negotiated and approved by an effective special committee of independent directors and/or approved by a majority of the stockholders independent of the controlling stockholder. That is, even if an independent board attempts to wholly replicate the situation that pertains when there is no controlling stockholder by hinging the procession of the merger on: (1) negotiation and approval of the merger by independent directors on an adversarial basis; and (2) approval by disinterested stockholders, the *Lynch* doctrine says that the entire fairness standard governs. The rationale for this rule is that the potential power of the controlling stockholder to act in ways that are detrimental to independent directors and unaffiliated stockholders is supposedly so formidable that the law's prohibition of retributive action and unfair self-dealing is insufficient to render either independent director or independent stockholder approval a reliable guarantee of fairness.[18]

■ Because these devices are thought, however, to be useful and to incline transactions towards fairness, the *Lynch* doctrine encourages them by giving defendants the benefits of a burden shift if either one of the devices is employed.

That shift transfers the burden of persuasion as to the issue of fairness from the defendants to the plaintiffs.

The practical effect of the *Lynch* doctrine's burden shift is slight. One reason why this is so is that shifting the burden of persuasion under a preponderance standard is not a major move, if one assumes, as I do, that the outcome of very few cases hinges on what happens if in the evidence is in equipoise. Certainly, at a pre-trial stage, it is hard to imagine how this shift in burden would change the outcome of a typical motion for dismissal for failure to state a claim or for summary judgment.

Another factor is even more important, which is that the determination of whether the burden should shift under the *Lynch* doctrine is the kind of decision that can usually be only made after a trial or, at the earliest, on undisputed facts that have emerged from a discovery record developed before the filing of a motion for summary judgment.[19] For example, in a case involving a controlling stockholder merger negotiated by a special committee of independent directors, the defendants must show that the special committee had "real bargaining power" vis-à-vis the controlling stockholder, was not dictated to by her, and complied with its fiduciary duties of

85, 96–97 (Del.2001) (entire fairness standard applied when a majority independent board approved a merger with entities owned by the company's controlling stockholder, chairman, and chief executive officer); *see also In re Pure Res.*, 808 A.2d at 435–37 (discussing the *Lynch* doctrine); William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1306–09 (2001) (same); Leo E. Strine, Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499, 509–12 (2002) (same).

18. *Lynch*, 638 A.2d at 1116. *But see Aronson v. Lewis*, 473 A.2d 805, 817 (Del.1984) (independent directors can impartially consider a

demand to have the corporation sue a controlling stockholder).

19. There may be more of a possibility to achieve the burden shift at a pleading stage when the burden-shifting device is a majority of the minority vote. In the absence of a properly-pled claim of improper disclosure or voter coercion, the existence of the majority of the minority condition and the outcome of the vote should be sufficient to provide a shift of the burden relatively early in the proceedings. Because of the factual intensiveness of the financial fairness determination, however, the *Lynch* doctrine will generally preclude dismissal or summary judgment in such cases.

care and loyalty.[20] Recently, the Supreme Court expressly held that defendants could not meet their burden to prove a valid special committee process at the pleading stage and that a full factual record had to be developed.[21] And, even if the defendants could obtain the burden shift more easily, that would still not obviate the need for a trial so long as the plaintiffs produce evidence creating a genuine dispute of fact regarding the economic fairness of the transaction.

Thus, because of the factually intense nature of the burden-shifting inquiry and the modest benefit obtained by defendants from the shift, it is unsurprising that few defendants have sought a pre-trial hearing to determine who bears the burden of persuasion on fairness. Unless the discovery process has generated a factual record that the defendants believe is sufficient to generate the actual entry of judgment in their favor on the ultimate issue of fairness, it will generally be inefficient for them to seek a burden-shift before trial. To do so would be to put the parties and the court through an expensive, time-consuming pre-trial evidentiary hearing that would involve most of the same proof that the defendants would eventually submit at a trial going to the decisive issue of fairness.[22] Put bluntly, in order to prove that a burden shift occurred because of an effective special committee, the defendants must present evidence of a fair process. Because they must present this evidence affirmatively, they have to act like they have the burden of persuasion throughout the entire trial court process.

These realities suggest that the *Lynch* doctrine, if it is to be perpetuated, could be usefully simplified. When the *Lynch* doctrine governs, it would be simpler to take one of two approaches. If it is thought that giving the plaintiff the opportunity to litigate a case under a favorable fairness standard is sufficient if one of three fairness-enhancing circumstances exist — a majority of independent directors, special committee approval, or majority of the minority approval — then the burden of proving unfairness could be placed on, and remain with, the plaintiff from the beginning.[23] This would give the plaintiff the

20. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1223–24 (Del.1999); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del.1997).

21. *See Krasner v. Moffett*, 826 A.2d 277, 279 (Del.2003).

22. Theoretically, there are circumstances in which a party could move for a decision that the record as to procedural fairness is so pristine as to generate a basis for the court to rule, on undisputed facts, that the burden on fairness has shifted, that the merger process was fair, and that the only remaining issue was financial fairness. In reality, the economic merits rarely are altogether severable from the process by which the transactional price was developed, and the history to date has been that these theoretical circumstances remain just that, theoretical.

23. In other decisions, it has been suggested that the business judgment rule standard of review ought to, at the very least, apply if a merger or other transaction with a controlling stockholder has been approved by a majority independent board *and* conditioned on a majority of the minority (*i.e.*, disinterested) vote. *See, e.g., In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 435 n. 16 (Del. Ch.2002). In such circumstances, the procedural process has largely replicated the conditions that pertain in a third-party merger. *See 8 Del. C.* § 251(c) (contemplating board and stockholder approval); *see also 8 Del. C.* § 144(a)(1)–(2) (merger is not voidable if approved by a majority of disinterested directors or a majority of disinterested stockholders). If that standard of review applied, plaintiffs would still have the opportunity to state a claim if they pled facts demonstrating that a merger approved in that manner was, in reality, tainted by fiduciary misconduct. But, in the absence of such pled facts, dismissal would be in order. Likewise, at a later stage, plaintiffs would be able to go to trial if they could show

opportunity to survive a motion to dismiss if she pleads, or summary judgment if she elicits in discovery, facts that support an inference of unfairness. These facts could include evidence tending to show, for example, that a supposedly independent committee in fact had no real leverage or acted subserviently to the controlling stockholder. But there would never be a "burden shift."

Alternatively, the burden of persuasion to prove fairness could rest at all times on the defendants, if the danger of transactions with controlling stockholders is thought to justify that stringency. In this formulation, it would be powerful evidence of fairness that a merger was approved by an effective special committee or by a fully-informed majority of the minority vote.[24] But that evidence would go to the ultimate issue of fairness only and not also have the intermediary effect of shifting the burden of persuasion.

The effect of either of these alternatives would be to focus the energy of litigants and the court on the decisive question in the case — fairness — and to avoid time-consuming questions that are of little practical consequence. The further effect would be to recognize that a judicial standard of review is designed to be a tool that judges use to decide cases and not as an after-the-fact label to be placed on a result.

The disproportionate energy that is now devoted to determining the appropriate standard review in "interested merger" cases has another aspect that is relevant here. Because the *Lynch* doctrine makes it so difficult to resolve cases short of a full trial, defendants have an incentive to try to show that a merger involving a large, but not majority, block holder does not implicate the entire fairness standard because the large block holder is not a "controlling stockholder." If the defendants can convince the court that the large block holder is not a controlling stockholder, then the presence of an independent board majority will invoke the business judgment rule standard of review,[25] leading to probable victory for the defendants without the need for trial.[26] Thus, unlike the burden shift under *Lynch*, the question of whether the standard of review is entire fairness or the business judgment rule is consequential and worth fighting over from a litigant's perspective.

But in another important way, the practical effect of the unique treatment of "controlling stockholder" transactions (as opposed to other interested transactions) is similar to that which obtains under the subsidiary burden shifting process of *Lynch*, Because the question of whether a large block holder is so powerful as to

---

that, despite the facially fair process, the merger was, in fact, the product of fiduciary misconduct, unless that misconduct was fairly disclosed to the disinterested stockholders, who thereafter, nonetheless, assented to the merger.

**24.** This was the proposition suggested by the Supreme Court in *Weinberger v. UOP, Inc.,* 457 A.2d 701, 703, 709 & n. 7 (Del.1983).

**25.** *See In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at *26 (Del.Ch. May 22, 2000) ("The policy rationale requiring some variant of entire fairness review ... substantially, if not entirely, abates if the transaction

in question involves a large though not controlling shareholder. In other words, because the absence of a controlling shareholder removes the prospect of retaliation, the business judgment rule should apply to an independent special committee's good faith and fully informed recommendation.").

**26.** Unless the plaintiffs can show that the independent board majority was duped by the interested block holder, abdicated its responsibilities so as to have acted in subjective bad faith, or acted so irrationally so as to have committed a violation of their duty of care, the business judgment standard of review would condemn their claims.

have obtained the status of a "controlling stockholder" is intensely factual, it is a difficult one to resolve on the pleadings. And, at later stages, the question of whether the large block holder has "control" may be relevant, and intertwined with, the question of whether the merger was approved by uncoerced, independent directors seeking solely to advance the interests of the corporation and its disinterested stockholders rather than by supine servants of an overweening master. Put another way, the absence of triable facts showing the presence of control will also tend to show that the merger was approved by independent directors and was, therefore, fairly approved.

In cases when the determination of whether control exists turns on disputed facts, it is impossible to determine whether a large block holder is a controlling stockholder until an evidentiary hearing is held. Because the proof of that question overlaps with the trial evidence regarding the fairness of the merger process, it will rarely, if ever, be efficient to hold such a hearing before trial. Rather, it will be efficient for all concerned to try the questions at the same time because the defendants' attempt to show that the independent directors acted freely and assertively in the corporation's best interests without being controlled by the large block holder is evidence both that the large block holder was not in control and that the merger was negotiated fairly. Therefore, the question of what standard of review the court is to use to decide such a case will usually be determined as part and parcel of the court's decision on the merits, unless the defendants concede that the large block holder is a controlling stockholder for purposes of the *Lynch* doctrine.

Given these realities, it is therefore unsurprising that the parties in this expedited case have briefed the question of the appropriate standard of review as part of their post-trial arguments. I resolve their disagreement now.

### B. *Does the Lynch Doctrine Apply?*

The parties engage in pitched battle regarding whether Carbonell is a "controlling stockholder." In arguing that Carbonell is not a controlling stockholder, the defendants emphasize that he does not control a majority of the company's voting power and that he does not control or dominate the special committee. They compare this to the situation in the recent case of *In re Western National Corp. Shareholders Litigation.*[27] In that case, Chancellor Chandler found that a 46% stockholder was not a controlling stockholder for purposes of the *Lynch* doctrine.

■ Candidly, I think it would be naïve for me to conclude that Carbonell does not possess the attributes of control that motivate the *Lynch* doctrine. Although it is true that he does not control a majority of the company's voting power, that was also true of the controlling stockholder in *Lynch* itself, which only controlled 43.3% of the votes. Moreover, in *Lynch* the stockholder held to have control was (in simplified terms) limited contractually to naming no more than five of the company's eleven directors.[28] Likewise, in *Western National*, the 46% stockholder was limited to electing two members of the board for a period beyond the merger at issue and was subject to certain restrictions on the purchase of additional shares.[29]

In practical terms, Carbonell holds a large enough block of stock to be the

---

27. 2000 WL 710192 (Del.Ch. May 22, 2000).

28. *See* 638 A.2d at 1112.

29. *See* 2000 WL 710192 at *2.

dominant force in any contested Cysive election. This is especially so when one considers the practical realities of his voting power, which must take into account the votes of his subordinate Lund and family members.[30] Although I do and need not find that either Lund or Carbonell's relatives are merely servile tools of Carbonell, the natural inference from the record is that they are close allies of his who have benefited in material ways from his managerial control of Cysive. At this stage of their relationship, Lund and Carbonell's familial subordinates can safely be considered part of a unified voting coalition.

Given this voting power, the threat of "inherent coercion" that Carbonell presents to the independent directors and public stockholders of Cysive cannot be rationally distinguished from that found to exist in *Lynch*, or cases of its kind.[31] If Carbonell becomes dissatisfied with the independent directors, his voting power positions him well to elect a new slate more to his liking without having to attract much, if any, support from public stockholders.

The conclusion that Carbonell possesses the attributes that the *Lynch* doctrine is designed to address is reinforced when one takes into account the fact that Carbo-

nell is Chairman and CEO of Cysive, and a hands-on one, to boot. He is, by admission, involved in all aspects of the company's business, was the company's creator, and has been its inspirational force. His practical control is also evidenced by the presence of two of his close family members in executive positions at the company, and the fact that his sister has also worked at the company in the past. Carbonell's day-to-day managerial supremacy serves to further distinguish this case from *Western National*, wherein the 46% stockholder played no meaningful role in the ordinary managerial operations of the company.[32]

Given these factors, it cannot be that the mere fact that Carbonell did not interfere with the special committee is a reason to conclude that he is not a controlling stockholder. A controlling stockholder — even one who owns a majority of the shares — may, one hopes, conduct herself admirably, by electing independent directors in the first place and giving them due authority and respect in the context of a particular transaction, such as a management buyout. That good conduct is evidence of fiduciary compliance and fair dealing. It cannot rationally be the basis for determining the judicial standard of review that applies, if one accepts the premise upon

---

**30.** In my calculus, I also take into account the fact that a 100% turn-out is unlikely even in a contested election. *See Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1381 (Del.1995). A 40% block is very potent in view of that reality.

**31.** *See Tremont*, 694 A.2d at 428 (describing the inherent coercion present when a controlling stockholder is on the other side of a transaction as involving the "risk ... that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder."). The underlying premise of this doctrine is discussed more fully in *In re Pure Resources, Inc., Shareholders Litigation*, 808 A.2d 421 (Del.Ch.2002); Leo E. Strine,

Jr., *The Inescapably Empirical Foundation of the Common Law of Corporations*, 27 Del. J. Corp. L. 499 (2002); William T. Allen et al., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287 (2001).

**32.** *See* 2000 WL 710192 at *6. Whether or not "inherent coercion" should be given the weight *Lynch* accords it is debatable, but it is, at this point, an important concept within Delaware's common law of corporations. Because it is unnecessary and because of the press of time, I do not address some of the defendants' provocative arguments regarding whether the *Lynch* doctrine should be modified.

which the *Lynch* doctrine is based. That premise is that controlling stockholders possess such potent retributive capacity that the entire fairness standard must apply regardless of the presence of an independent board majority, an effective special committee, and/or a majority of the minority provision. In the presence of these indicia that the controlling stockholder did not abuse its power, the only consequence is a burden shift, leaving the plaintiff free to prevail if it can show an unfair economic outcome.

In view of that framework, the analysis of whether a controlling stockholder exists must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes. Carbonell has that capability and would be perceived as having such capability by rational independent directors, public stockholders, and other market participants.

Having determined that Carbonell is a controlling stockholder, I am therefore bound — per the *Lynch* doctrine — to engage in a fairness analysis.

### C. *Is the Snowbird Agreement Fair?*

My review of the fairness of the Snowbird Agreement follows the familiar form. The entire fairness inquiry requires the trial court to examine the fairness of both the process and the result of the transaction under challenge, and to use those separate inquiries to reach a reasoned and singular conclusion as to whether the challenged transaction is fair.[33]

### 1. *The Fairness of the Process Leading to the Snowbird Agreement*

As noted, the defendants have the initial burden to show that the special committee

process was effective enough to warrant burden-shifting under the *Lynch* doctrine. For reasons of efficiency and clarity of logic, I choose instead to jump right into the thick of the fairness inquiry. The intermediate issue of burden-shifting might possibly be of moment in some cases but not in this one. In passing, I will note my decision as to whether the ultimate burden of persuasion has shifted, but it will only be in passing and the remainder of my analysis treats the fairness question itself, without unnecessary dilation on which side bears the burden.

■ I begin with my conclusion. After considering the record, I conclude that the process leading to the execution of the Snowbird meets the exacting standard of entire fairness. Several factors support this judgment.

First, the decision to enter into the Snowbird Agreement was preceded by an active and aggressive search for a third-party buyer. This search was undertaken by a skilled investment bank with the aid of top managers who were motivated to find a buyer who would pay a good price. The Cysive board undertook this exploration of strategic alternatives in order to secure the interests of the stockholders of Cysive. This market check also served to provide the best possible indication of the market value of Cymbio as an individual software product and Cysive as an entity. Although the plaintiffs argue that Broadview did not market Cymbio separately, that contention lacks any substantive force. Broadview marketed Cysive to key technology companies, using the advantages of Cymbio as its key marketing tool. If any of these companies had an interest,

33. *See, e.g., Weinberger,* 457 A.2d at 711 ("[T]he test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.").

they could have purchased Cymbio separately in an appropriately structured deal, and Broadview's marketing efforts made this clear. The notion that none of these sophisticated parties would have realized that if Cysive was willing to sell all of itself — including its cash assets — it would obviously sell Cymbio and be in a position to send the cash (net of debts) to its stockholders along with the sale proceeds from selling Cymbio. Stated simply, there was an effective market check undertaken before the Snowbird proposal was even advanced.

Second, once the Snowbird offer was made, a special committee was set up that had full authority to negotiate with Carbonell on Cysive's behalf regarding that transaction.[34] That committee was comprised of two independent directors with relevant expertise. Each devoted substantial time to the committee's work and selected qualified, independent advisors. Though the plaintiffs challenge the special committee's decision to engage Broadview, I do not perceive Broadview as having been conflicted due to their prior engagement working for Cysive to sell the company. In that role, Broadview was accountable to and was hired by Cysive's board. Although it is true that Broadview worked on a daily basis with company management in the sales process, an independent board majority existed that had approved Broadview's retention. Once Carbonell became a buyer, Broadview's reporting authority went straight to the special committee, and it acted as a vigorous negotiator on the committee's behalf. Likewise, the committee's legal advisors had no conflict.

Most important, the record indicates that the special committee took its responsibilities seriously. The committee bargained hard with Snowbird, holding out to get a higher price and ensuring that the committee retained the flexibility to accept a higher bid. Indeed, throughout the negotiations — and, indeed, to this day — the committee has entertained inquiries and has worked diligently to develop a higher-value alternative for Cysive's public stockholders.

In this process, the committee has not been subjected to threats from or strong-arming by Carbonell. Rather, Carbonell has given the committee the leeway to fulfill its fiduciary duties, and the committee members have used that space to act as the stockholders' advocates. To that end, the committee negotiated with Carbonell aggressively and obtained a price above liquidation value and the pre-announcement price of Cysive's stock, thereby guaranteeing an immediate and certain return to the public stockholders. At the same time, the committee retained the flexibility to accept a higher bid, thus subjecting the Snowbird Agreement to a post-signing market check.

■ As I have discussed, the process was marred by an improper act by Lund, who failed to turn over to the special committee and its advisors a revised budget he prepared in April. This failure, however, did not materially impair the effectiveness of the negotiation and approval process because the document that Lund did not turn over did not contain any reliable information that would have changed the outcome of the committee's deliberations. The April Budget did not contain estimates of revenues in which Lund placed confidence; they instead merely parroted a previously higher estimate that had been shared with the special committee, but lowered the figure for the year to account for the failure of any first quarter sales to

34. *See* JX 121.

materialize. After observing Lund endure tough questioning from the plaintiffs and me about this subject, hearing the other testimony, and considering the relevant documents, I am persuaded that the reason he did not turn over the document was because he genuinely believed it not to be reliable and not to contain material information. His failure to provide the document was an improper error in judgment, but I conclude that it was not motivated by any illicit or selfish purpose. Instead, Lund was reluctant to provide information that he thought was inherently untrustworthy and that had become even more stale by the May timeframe when he was asked to provide a revenue estimate and declined to do so on the basis that it could not be done responsibly. Of course, the approach Lund should have taken as a fiduciary in that circumstance was to disclose the April Budget but simultaneously to have provided the necessary context so that it is used properly. But, in any case, I conclude that Lund's error in disclosure did not, as a matter of fact, create any harm to the process.[35]

Third, the presence of an independent board majority is another factor supporting procedural fairness. Director Korin declined to serve on the special committee because he had some interest in continuing with Cysive if the Snowbird Agreement was consummated. This desire alone does not compromise his independence.[36] Korin is not materially dependent on his director's compensation at Cysive and was part of a board majority that supported looking for a third-party buyer to maximize value for the public stockholders. The fact that Korin, Holec, and Gillis were a majority of the board, and were independent directors, weighs in favor of fairness.

Finally, it bears re-emphasis that the process leading to signing of the Snowbird Agreement resulted in a merger agreement that allowed for a post-signing market check. The committee has taken advantage of that post-signing market check to consider overtures from other possible buyers. Negotiations with seven such parties have occurred since signing. Thus, the committee retained the flexibility to abandon the Snowbird Agreement in favor of a better deal and did not subject the

---

**35.** The failure of Lund to disclose the April Budget became the key issue at trial and in the briefs. During trial, the special committee met with Broadview and specifically considered whether its view of the Snowbird Agreement was affected by anything in the April 2003 budget document. The special committee and Broadview determined that the document would not have affected the committee's analysis because it simply contained a lower and equally unreliable revenue estimate than information already in the committee's possession. Because the special committee and Broadview were tracking sales activity, they were aware that Cysive had no reliable revenue estimates because it had no sales as of that time, or as of the time of the trial. Although the plaintiffs argue that the committee should have provided CBIZ with the document and seen whether CBIZ's view would have changed, CBIZ's representative testified in his deposition that only *reliable* revenue numbers would have caused CBIZ to give Cymbio a value. As it is, the failure of Cysive to sell Cymbio and the absence of a higher bid by strategic buyers is the most convincing evidence of the market value of Cymbio.

**36.** See *Orman v. Cullman,* 794 A.2d 5, 28–29 (Del.Ch.2002) ("No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest." (emphasis in original)); *Krim v. ProNet, Inc.,* 744 A.2d 523, 528 n. 16 (Del. Ch.1999) ("[T]he fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.").

company to any unreasonable penalty for doing so. Although it is true that a third-party offeror would likely want Carbonell's support as a stockholder, nothing in the record suggests that Carbonell would not sell for the right price or that he has in any way improperly impeded the committee's exploration of other options.

For all these reasons, I am persuaded that the process leading to the Snowbird Agreement satisfies the test of fairness, regardless of which party bears the burden of persuasion. For reasons I have spelled out, the special committee process was effective enough to warrant that the ultimate burden of proving unfairness must rest on the plaintiffs, under the *Lynch* doctrine.

### 2. *The Financial Fairness of the Snowbird Agreement*

The plaintiffs' challenge to the financial fairness of the Snowbird Agreement turns on one major fact: the failure of CBIZ to give value to Cymbio in its liquidation analysis. Given that Carbonell is willing to pay a price higher than liquidation, say the plaintiffs, how can it be rational for CBIZ to put no value on Cymbio in its liquidation valuation? The plaintiffs then combine this argument with an appeal to the revenue figures contained in Lund's April Budget, which they argue show that Cymbio was reasonably expected to generate substantial cash flows.

█ These arguments, while creatively made, dissolve upon close examination. As I have already noted, the April Budget did not contain reliable revenue estimates. As of trial, Cysive had yet to sell Cymbio to any buyer for a commercially attractive price.[37] The commercial value and viability of Cymbio is therefore intrinsically uncertain. But the best evidence of whether it has value is the absence of a bid by other major technology companies.[38] If Cymbio is the next big thing in technology, these major players all missed it.

Now, Carbonell obviously believes that Cymbio has real potential and he wants to take the risk of proving its viability. That is why he is paying a price that is six cents per share over CBIZ's May 29, 2003 liquidation value and fifteen cents per share over his own May estimate of Cysive's liquidation value.[39] It is this premium that represents the payment the Cysive stockholders are receiving for Cymbio. The fact that Carbonell believes that he is receiving more value than he is paying is not, one hopes, a novel economic concept to the plaintiffs, or to the reader. In a sales transaction, one presumes that the buyer believes that what he is receiving is worth more to him than what he is giving up. Otherwise, it would be odd for the transaction to transpire.

Here, however, there is strong evidence that liquidation value is the correct benchmark against which to assess the fairness of the transaction. Given the substantial efforts that have been undertaken to find other buyers and the market's knowledge that Cysive is for sale, the absence of

---

**37.** In the product development phase, Cysive had provided Cymbio to clients using other Cysive services. The company has yet to sell Cymbio at a price that would be considered a profitable deal for the sale of software of its type, and its sales goals have been entirely unrealized.

**38.** The plaintiffs' financial expert premised his opinion on the reliability of sales and revenue estimates contained in the April Budget and the prior Budgets. Because these are inherently unreliable and because the plaintiffs have produced no evidence that sales of Cymbio are imminent, his testimony does not undermine the fairness of the deal price.

**39.** *See* Tr. at 210.

another party willing to make a higher bid than the Snowbird offer is strong evidence of financial fairness.[40] Buttressing this conclusion is the fact that the $3.22 per share Snowbird offer exceeds the pre-affected trading price of Cysive shares by 37 cents per share.[41]

In assessing fairness, it is also important to note that the plaintiffs' preferred alternative of liquidation involves inherent uncertainty, both as to timing and results. The company would have to step down its payroll and negotiate and pay out severance and other departure benefits – a messy process at best. The company would also have to extract itself from leases (in an unfavorable market) and pay off other obligations. There would be transaction costs. And there would be delay. Given these factors, it is not surprising that the plaintiffs have not quibbled with CBIZ's liquidation estimate, except for its failure to give value to Cymbio. Nor have they disputed that the liquidation value of Cysive is lower today than it was at the time the Snowbird Agreement was executed because the company has continued to make expenditures without generating revenues.

In sum, I conclude that the financial terms of the Snowbird Agreement are fair, regardless of which party has the burden of persuasion.

### D. *No Injunction Shall Issue*

Because the Snowbird Agreement has survived fairness scrutiny, the plaintiffs' request to enjoin the consummation of the merger contemplated by that agreement is denied. The defendants shall also be entitled to a declaratory judgment that the plaintiffs' claims, based on their actions to the date of trial, should be dismissed as there is no basis for the provision of relief.[42]

▮ As an alternative matter, I also note that I would not issue an injunction here because the harm an injunction would threaten to the Cysive public stockholders outweighs any benefit that they might achieve if the Snowbird Agreement is enjoined. Because of the absence of a higher bid and the company's cash burn rate, I lack confidence that an injunction would not be detrimental to the stockholders' best interests.[43] Nor do I take up the

---

**40.** The plaintiffs have argued in the alternative that the transaction is subject to review under the reasonableness standard of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1983), if it is not subject to the *Lynch* doctrine. The defendants argue that the plaintiffs are confused and that *Revlon* cannot pertain if there is a controlling stockholder. Whether *Revlon* duties pertain in a cash deal involving a controlling stockholder is an interesting question, the answer to which has little practical effect. Because entire fairness is the most exacting form of review, and because the Snowbird Agreement passes muster under that test, it is difficult to see how the intermediate *Revlon* standard could be violated. In any event, the sales effort undertaken on behalf of Cysive represented a reasonable means by which to obtain the highest value reasonably available. Thus, *Revlon* and its underlying purpose — empha-

sizing the long-recognized duty of a fiduciary selling an asset to try to get the best deal – are satisfied.

**41.** On the day before Cysive announced it was in discussions with Carbonell, the last reported trade was at $2.85 per share.

**42.** That is, the plaintiffs are entitled to neither injunctive nor monetary relief as there has been no wrongful act of any defendant that has caused harm. Specifically, if it is the defendants' burden to show that Lund's failure to disclose the April Budget did *not* cause injury, they have met that burden.

**43.** *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del.1988) ("[I]n evaluating the need for a preliminary injunction, the Court must balance the plaintiff's need for protection against any harm

558

plaintiffs' fallback position, which asks me to enjoin the merger until CBIZ can perform a new liquidation value taking into account the April Budget and other factors relevant to Cymbio's value. The record persuades me that there has already been a reliable market-based test of that value, which was considered by the special committee and the full Cysive board in deciding to enter the Snowbird Agreement.

### III. *Conclusion*

For the foregoing reasons, the defendants are entitled to judgment in their favor. This judgment, for obvious reasons, does not insulate them from challenge for actions taken after the time of the events dealt with at trial, and the parties shall craft a final order that reflects that reality. The defendants shall submit a proposed final order, upon approval by the plaintiffs as to form, within ten days of the date of this opinion.

that can reasonably be expected to befall the defendants if the injunction is granted. If the former outweighs the latter, then the injunction should issue.").