# IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE ORACLE
CORPORATION
DERIVATIVE LITIGATION

§
§
§
§
§
§
§
§
§
§

No. 139, 2024

Court Below: Court of Chancery
of the State of Delaware

C.A. No. 2017-0337
CONSOLIDATED

Submitted: October 23, 2024
Decided: January 21, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED**.

Joel Friedlander, Esquire (*argued*), Jeffrey M. Gorris, Esquire, David Hahn, Esquire, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Christopher H. Lyons, Esquire, Tayler D. Bolton, Esquire, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, Esquire, David A. Knotts, Esquire, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Gregory Del Gaizo, Esquire, ROBBINS LLP, San Diego, California *for Plaintiffs Below/Appellants*.

Elena C. Norman, Esquire, Richard J. Thomas, Esquire, Alberto E. Chávez, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Peter A. Wald, Esquire (*argued*), LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly, Esquire, LATHAM & WATKINS LLP, New York, New York; Melissa Arbus Sherry, Esquire, Christopher S. Turner, Esquire, Blake E. Stafford, Esquire, LATHAM & WATKINS LLP, Washington, D.C. *for Defendants Below/Appellees Safra A. Catz and Lawrence J. Ellison*.

Kevin R. Shannon, Esquire (*argued*), Berton W. Ashman, Jr., Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Arthur H. Aufses III, Esquire, Jonathan M. Wagner, Esquire, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York *for Non-Party-Below/Appellee Special Litigation Committee of the Board of Directors of Oracle Corporation*.

**SEITZ**, Chief Justice:

Oracle Corporation acquired NetSuite Inc. in 2016. Following the acquisition, Oracle stockholders filed a derivative suit against the Oracle directors and others. They alleged that Lawrence Ellison, a co-founder of and substantial equity holder in both companies, forced Oracle to overpay for NetSuite. After the Court of Chancery denied the defendants' motion to dismiss, the Oracle board formed a special litigation committee ("SLC") to review the plaintiffs' derivative claims. The SLC investigated and tried to settle the suit, but it eventually returned the case to the plaintiffs to pursue. The parties litigated over five years and through the COVID-19 pandemic. The Court of Chancery issued six pre-trial decisions and held a ten-day trial. In its post-trial opinion, the court entered judgment for the remaining defendants after concluding that the special committee negotiated the NetSuite transaction untainted by Ellison's or Oracle management's influence.

On appeal, the stockholders contend that the court erred by: (1) allowing the SLC to withhold its interview memos from the plaintiffs; (2) applying business judgment review to a transaction involving an alleged controlling stockholder; (3) employing the wrong legal standard when evaluating whether Ellison misled the special committee by allegedly concealing his future NetSuite plans; and (4) finding that Ellison's alleged undisclosed future operational plans were immaterial to the

2

special committee's evaluation and negotiation of the transaction. After careful review, we affirm the Court of Chancery's judgment.

I.

A.

We rely on the facts as found after trial.[1]  Oracle is a technology company offering software, hardware, and cloud computing technologies.  Its founder, Lawrence Ellison, has served on its board of directors since 1977 and was Chief Executive Officer ("CEO") until September 2014.  At that time, he became Chief Technology Officer and Executive Chairman of the Board.  Safra Catz and Mark Hurd succeeded Ellison as co-CEOs.  Hurd died in late 2019, at which point Catz became the sole CEO.

In the 2000s, Oracle accelerated its growth strategy through acquisitions. When Doug Kehring became Oracle's Head of Corporate Development in 2006, he implemented a standard framework for assessing potential acquisition targets, which included a regularly updated dossier on select companies of interest.

NetSuite was one of these companies.  Before the Oracle acquisition, NetSuite was a technology company offering cloud-based enterprise resource planning

---

[1] *In re Oracle Corp. Deriv. Litig.*, 2023 WL 3408772 (Del. Ch. May 12, 2023) [hereinafter *Post-Trial Opinion*].  Except for their disclosure claim, the plaintiffs raise only legal errors on appeal. Thus, the facts are drawn from the *Post-Trial Opinion*, documents cited by the Court of Chancery, and the Court of Chancery record.

("ERP") and commerce software suites. Unlike Oracle, which primarily sold customizable on-premises products to large customers, NetSuite for the most part sold off-the-shelf cloud-based products to smaller customers. NetSuite's co-founder, Evan Goldberg, was a former Oracle employee. At the time of the transaction, he served as NetSuite's Chief Technology Officer and Chairman of the Board.

Oracle's interest in NetSuite started with Ellison. Ellison had long eyed NetSuite as an Oracle acquisition target. He regularly made his views known to "anyone who would listen" and "even to people who wouldn't."[2] In February 2015, Ellison met with Catz and Hurd to discuss a potential acquisition. Although Hurd was supportive, Ellison was not convinced that the timing was right, a sentiment echoed by Catz. Ellison was concerned that NetSuite was trading at such a high premium that the acquisition would be dilutive to Oracle's earnings. Ellison was also concerned that the acquisition would distract Oracle management and confuse the technology marketplace as Oracle transitioned its product offerings from on-premises to cloud-based software. Unlike on-premises software, which is installed and maintained "on the premises" of the customer, cloud-based software is hosted and maintained off-premises by a third-party. And Oracle's own cloud-based ERP

---

[2] App. to Appellants' Opening Br. at A1266 [hereinafter A__] (Tr. 1664:6–24); A1345 (Tr. 1980:4–15).

4

product, Fusion, was just beginning to gain traction in the market after a decade of development. To avoid upsetting the delicate transition period, Oracle did not pursue an acquisition of NetSuite in early 2015.

Oracle did not, however, lose interest. Later that year, NetSuite failed to meet its bookings growth rate projections. NetSuite attributed the flattening growth to its pursuit of customers who required significant software customization, which produced non-recurring and low-margin revenue and slowed down implementation time. These customers were often larger in size and required new functionalities to service their scale.

Ellison believed that NetSuite could not compete against Oracle, whose primary customer base consisted of large enterprise customers. In October 2015, Ellison met with NetSuite leadership – including Goldberg, CEO Zachary Nelson, and President Jim McGeever – to discuss his concerns. During the meeting, Ellison advocated for a new growth strategy focused on designing software functionalities for specific industries and subindustries in the small and medium business ("SMB") market. This resulted in Project Atlas, later renamed SuiteSuccess. SuiteSuccess is a pre-built software solution that leaves room for customization only during the "last mile" of implementation. Its target customers were cost-conscious businesses with little need for extensive customization. With SuiteSuccess, NetSuite would shift

5

away from low-margin implementation fees, reduce implementation time, and boost customer satisfaction.

While NetSuite developed SuiteSuccess, it continued to develop upmarket financial functionalities.[3] McGeever continued to push for these functionalities because he believed "the fundamental thing of [NetSuite's] value proposition was that we needed to be very strong in pure financials . . . ."[4] The Court of Chancery nevertheless found that, despite NetSuite's continued development of these up-market financial functionalities, NetSuite had "tempered its indiscriminate move upmarket when it began developing [SuiteSuccess]."[5]

Shortly before Oracle's January 14–15, 2016, board retreat, Ellison told Catz that he believed "the time is now" for Oracle to buy NetSuite.[6] At the board retreat, Kehring presented three potential acquisition targets, one of which was NetSuite. It was the first time that Oracle management discussed a potential acquisition of NetSuite with the Oracle board. Before the NetSuite presentation, Ellison left the room and recused himself from the discussion. After the presentation, the board

---

[3] A1030 (Tr. 724:6–725:2).

[4] A848 (Tr. 79:6–8).

[5] *Post-Trial Opinion* at *30.

[6] A1345 (Tr. 1982:10–11).

6

directed Catz and Hurd to gauge NetSuite's interest in a potential acquisition. The board instructed the co-CEOs not to discuss price.

Four days later, on January 19, 2016, Catz had dinner with NetSuite's CEO Zachary Nelson. Catz asked Nelson whether NetSuite would be open to being acquired by Oracle. Nelson replied that any acquisition would have to involve a "Concur-type multiple," referring to the high revenue multiple from SAP's Concur acquisition in 2014.[7] The Court of Chancery found as a factual matter that Catz did not discuss price or make an offer during the dinner meeting.[8]

On January 27, 2016, Goldberg called Ellison and asked whether Oracle's pursuit of NetSuite was meant as punishment, which Ellison denied. Instead, Ellison framed the transaction as strategically advantageous to both companies. But Goldberg remained skeptical and was worried about NetSuite's and his own independence post-acquisition. Ellison assured Goldberg that, if acquired by Oracle, NetSuite would become a Global Business Unit, and Goldberg would report directly to Hurd or Ellison. Ellison also shared that he "was going to stay neutral and out of the discussions and out of the voting."[9] This was Ellison's last conversation with

---

[7] A1115 (Tr. 1062:5–1063:17).

[8] *Post-Trial Opinion* at *6.

[9] A1308 (Tr. 1835:23–24).

Goldberg until the transaction closed in November 2016. Ellison did not disclose this phone call to the board or the later-formed special committee.

B.

On March 18, 2016, the Oracle board, with Ellison recused, formed a special committee ("Special Committee") to negotiate a potential transaction with NetSuite. The Special Committee was composed of Renee James, Leon Panetta, and George Conrades, all of whom reported no conflicts and were recommended by counsel. The Special Committee was fully empowered to control the transaction.

Over the course of the next seven months, the Special Committee met 15 times to consider the transaction. On April 8, 2016, the Special Committee held its first meeting, during which it elected James as the chair and engaged Skadden, Arps, Slate, Meagher and Flom LLP as counsel. During this meeting, members of Oracle management, including Catz and Kehring, discussed the strategic rationale for the transaction. On April 19, 2016, the Special Committee engaged Moelis & Company as financial advisor. The Special Committee chose Moelis over the other finalist, Evercore, in large part because Moelis raised alternatives to the NetSuite transaction and demonstrated its ability to challenge Oracle management.

On May 5, 2016, Moelis held an all-day diligence session attended by Skadden, James, Kehring, and two other Oracle employees. Moelis presented its findings that, although Fusion was successful with enterprise and near-enterprise

8

customers, it was not as well received by SMB customers. Moelis found that, in contrast, NetSuite was strong where Fusion was weak. Although NetSuite did sell to larger customers, NetSuite's target customer base was the middle market, which has "affectionately been referred to as the Fortune 5 million."[10]

James found the presentation persuasive. On May 13, 2016, the Special Committee met with Skadden without Oracle management. James reported that, "after listening to the presentation [from the May 5 due diligence session], I found [Oracle and NetSuite] to be very complementary."[11]

A week later, the Special Committee met with Skadden, Moelis, and Oracle management (including Catz and Kehring). Catz and Kehring highlighted the necessity for Oracle to invest further in ERP software and NetSuite's ability to fill that niche. Oracle management recommended that the Special Committee move forward with the acquisition and left the meeting. Subsequently, Moelis confirmed the view that NetSuite could boost Oracle's ability to compete in the cloud ERP space. The Special Committee determined that (1) acquiring NetSuite would be highly beneficial to Oracle, and (2) it was the right time to make an initial offer.

On May 23, 2016, Oracle representatives met with Moelis to discuss a preliminary financial model for NetSuite. Three days later, Skadden sent the Special

---

[10] A1022 (Tr. 692:5–6).

[11] A1138 (Tr. 1155:9–15).

Committee-approved recusal rules to Oracle management, who forwarded them to Ellison. On the same day, Catz spoke with Goldberg, who, despite expressing his unwillingness to sell NetSuite, understood his responsibilities to NetSuite and continued to push Oracle for a high price. Goldberg reported this phone conversation to the NetSuite board, but Catz did not report it to the Oracle Special Committee.

On May 27, 2016, the Special Committee met with Skadden, Moelis, and Oracle management (including Catz and Kehring) to discuss NetSuite valuations. Oracle management presented first. They shared discounted cash flow analyses, precedent transaction multiples, and a home-grown incremental model designed by Oracle's corporate development team. The incremental model "reflect[ed] the incremental revenue and expenses as a result of owning the target by which[,] . . . over a five-year-horizon, [Oracle could] accomplish."[12] It did not consider post-acquisition operating plans or overhead costs that would be allocated to NetSuite for accounting and budgeting purposes. Based on all the NetSuite valuations, Oracle management recommended an opening bid of $100 per share. Moelis representatives reviewed the models and raised questions with Oracle management. They ultimately concluded that the models were reasonable. After

---

[12] A986 (Tr. 548:12–15).

10

Oracle management left the meeting, Moelis presented their valuations and shared public market price targets, revenue multiples, and precedent transactions. Moelis advised that the opening bid should be no lower than $100 per share to secure NetSuite's interest. The Special Committee decided to submit an opening bid of $100 per share, which Moelis communicated to NetSuite's financial advisor on June 1, 2016.

On June 7, 2016, NetSuite responded with a counterproposal of $125 per share. The next day, the Special Committee raised its bid to $106 per share, which left room for Oracle to negotiate below its $110 ceiling. On June 11, 2016, NetSuite lowered its price to $120 per share but messaged that a lower price was unlikely. Two days later, the Special Committee met with Skadden, Moelis, and Oracle management (including Catz and Kehring), during which Oracle management recommended against countering. At this point, the Special Committee, was "prepared to let the possibility of acquiring NetSuite die."[13]

A few weeks later, in late June 2016, NetSuite's financial advisor, Qatalyst Partners, called Oracle's CFO, Stuart Goldstein, to share that NetSuite may be more flexible on price and to move the deal forward. The Special Committee met with Skadden, Moelis, and Oracle management (including Catz and Kehring). Catz and

---

[13] A1142 (Tr. 1173:6–9).

Kehring wanted more due diligence to assess NetSuite's forthcoming Q2 financial results. After Oracle management left the meeting, the Special Committee decided to conduct additional due diligence, which "signaled toughness on price and a lack of anxiety to re-start negotiations."[14]

On July 6, 2016, NetSuite's CFO, Ron Gill, presented NetSuite's Q2 financial results to Oracle management and Special Committee Chair James. While NetSuite had exceeded its earnings projections, its SaaS bookings subscription revenue was low. Catz believed that the Special Committee could use the decreased subscription revenue to "sow some negative thoughts," which "would help Oracle negotiate a better price."[15] After Catz reported the diligence call to the Special Committee, and following a series of additional diligence meetings, the Special Committee decided to remain firm at $106 per share.

On July 12, 2016, NetSuite lowered its price to $111 per share. Catz recommended that Oracle split the difference and counter at $108.50 per share. The next day, the Special Committee communicated its best and final offer of $109 per share, which NetSuite accepted the same day. On July 15, 2016, Oracle and NetSuite entered an exclusivity period. The transaction cleared additional due diligence by Oracle and antitrust review by the United States Department of Justice.

---

[14] *Post-Trial Opinion* at *13.

[15] A1218 (Tr. 1477:19–21).

The parties structured the transaction as a tender offer in which a majority of NetSuite shares unaffiliated with Ellison, NetSuite's officers, and its directors were required to support the transaction. The parties set the tender deadline for September 15, 2016, but extended it twice, largely due to uncertainty about the vote by NetSuite's largest unaffiliated stockholder, T. Rowe Price. T. Rowe Price believed that $109 per share was too low to tender and pushed Oracle to increase its offer to $133 per share. Nevertheless, the Special Committee refused to budge on price. When the twice-extended deadline expired on November 4, 2016, 53.2% of NetSuite's unaffiliated shares tendered. The acquisition closed three days later.

C.

On May 3, 2017, an Oracle stockholder filed a derivative suit in the Court of Chancery against Ellison, Catz, members of the Special Committee, and Oracle. The plaintiff alleged that "Ellison took advantage of Oracle's need for [a] cloud-based acquisition and used Oracle's money to overpay for NetSuite for the benefit of himself and his family, receiving nearly $4 billion from the Transaction – a massive return on Ellison's initial $125 million investment in NetSuite."[16] The plaintiff also alleged that Catz was Ellison's "hand-selected consigliere" and that the Special

_____

[16] Verified S'holder Deriv. Compl. ¶ 1, *Post-Trial Opinion*, Docket No. 1 [hereinafter Ch. Dkt. __].

13

Committee was "flanked by Oracle's senior management, to whom the Special Committee and its advisors deferred."[17]

After consolidating a related action, the Court of Chancery denied Ellison's and Catz's motion to dismiss.[18] The plaintiffs then voluntarily dismissed claims against all defendants except Ellison and Catz.

On May 4, 2018, the Oracle board formed an SLC to investigate the plaintiffs' claims. The SLC was fully empowered to control the litigation.[19] It was chaired by William Parrett with members Charles Moorman and Leon Panetta.[20] It retained its own independent counsel and financial advisor. The Court of Chancery stayed the litigation for thirteen months while the SLC investigated the claims and explored whether a settlement was feasible through non-binding mediation.

By mid-July 2019, the plaintiffs became frustrated that the SLC "ha[d] not yet submitted its report or provided notice to Lead Plaintiff of its position respecting the

---

[17] *Id.* ¶ 3.

[18] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *23 (Del. Ch. Mar. 19, 2018).

[19] *In re Oracle Corp. Deriv. Litig.*, 2019 WL 6522297, at *7 (Del. Ch. Dec. 4, 2019) [hereinafter *December 2019 Opinion*]. The SLC was authorized to "(i) take all actions necessary to investigate, analyze and evaluate all matters relating to this lawsuit and the claims made in the action, and (ii) take any actions that the SLC deems to be in the best interests of the Company in connection with this lawsuit and any related matters." *Id.* (citation omitted).

[20] *Id.*; *see also* J.A. to Appellees' Answering Br. at B3491–93 [hereinafter B__] (Mot. to Stay by the Special Litig. Comm. of the Bd. of Dirs. of Nominal Def. Oracle Corp. ¶¶ 12–18). Although Panetta also served on the Special Committee, the plaintiffs did not challenge his independence or fitness to serve on the SLC. Appellees' Answering Br. at 7 (SLC).

derivative claims" and "ha[d] not communicated with the Lead Plaintiff ever since the hearing on June 7, 2019."[21]  The Court of Chancery permitted the plaintiffs to file an amended complaint ("First Amended Complaint").  The First Amended Complaint named Ellison, Catz, Hurd, the Oracle board, the Special Committee (including Panetta, who now served on the SLC), Oracle (as nominal defendant), Goldberg, and Nelson.  Count One alleged breach of fiduciary duty against the Oracle defendants.  Count Two alleged aiding and abetting against the NetSuite defendants.

On August 15, 2019, the SLC's counsel informed the Court of Chancery that "it appears unlikely that a settlement can be reached in the near future" and that "the SLC has determined that the Lead Plaintiff should be allowed to proceed with the derivative litigation on behalf of Oracle."[22]  According to counsel, the SLC believed that "the critical legal issue of whether the challenged NetSuite acquisition will be reviewed under the entire fairness standard would not be resolved prior to trial, thereby posing risks to both plaintiff and defendants."[23]  As such, the SLC decided to return the case to the plaintiffs.

---

[21] Lead Pl.'s Mot. to Lift the Stay for the Limited Purpose of Filing Mot. for Leave to File Verified Am. Deriv. Compl. ¶ 7 (Del. Ch. July 18, 2019), Ch. Dkt. 134.

[22] A1916 (Letter from Potter Anderson & Corroon LLP to The Honorable Sam Glasscock III, Aug. 15, 2019).

[23] A1917.

15

D.

After the plaintiffs took over the case, they subpoenaed the SLC and its counsel. They requested virtually all documents and communications concerning the SLC's investigation, including any draft or final report prepared by the SLC. The plaintiffs argued, in essence, that all documents held by the SLC are relevant and must be produced. In resisting the subpoena, the SLC and its counsel argued that, because the SLC returned the litigation to the lead plaintiff, neither the court nor the parties needed to "address or evaluate the SLC's independence, investigation, or determination," rendering discovery "inappropriate and unnecessary."[24] They also argued that the subpoena improperly sought the production of privileged material. The SLC and its counsel also claimed that they could not produce any documents received from third parties without the latter's authorization and that, in any case, the plaintiffs could directly request these documents from the third parties. Finally, the SLC and counsel argued that the SLC files contained no relevant non-privileged documents that the plaintiffs could not obtain through usual discovery.

The Court of Chancery ordered the SLC to produce all relevant documents not subject to any valid privileges and objections raised by the SLC and the

---

[24] Lead Pl.'s Mot. to Enforce Subpoenas and Certificate of Serv., Ex. E at 1–2 (Del. Ch. Oct. 7, 2019), Ch. Dkt. 203.

individual defendants.[25]  It ruled that, as a threshold matter, "*Zapata*-style discovery

is unnecessary,"[26] meaning that the court was not reviewing an SLC's decision on

terminating the litigation.  The Court of Chancery then ruled that the plaintiffs were

> presumptively entitled to the production of all documents and communications actually reviewed and relied upon by the SLC or its counsel in forming its conclusions that (i) it would not be in Oracle's best interests to seek to dismiss the derivative claims and (ii) it was in Oracle's best interests to allow the Lead Plaintiff (rather than the SLC) to proceed with the litigation on behalf of Oracle.[27]

The "universe of documents" was, however, subject to, and limited by, the SLC's

privilege objections.[28]  The Court of Chancery held that, with limited exceptions, the

plaintiffs were not entitled to documents exchanged in the mediation proceedings.

The SLC complied with the Court of Chancery's *December 2019 Opinion*,

produced the required documents, and generated a privilege log for the documents

withheld on attorney-client privilege and work product grounds.  The plaintiffs

moved to compel further production, including memoranda of SLC interviews, a

PowerPoint prepared by the SLC's counsel summarizing the evidence, tables

summarizing NetSuite's financial performance, and a draft report of the SLC.

---

[25] *December 2019 Opinion* at \*19–20.

[26] *Id.* at \*14.

[27] *Id.* at \*18.

[28] *Id.*

The Court of Chancery denied the plaintiffs' motion to compel further production of documents.[29] First, the court determined that the SLC properly invoked work product protection and that the SLC did not waive this protection. It found that the plaintiffs failed to demonstrate that they could not obtain the substantial equivalent of the interview memos and other documents without undue hardship.[30] The court was not persuaded by the plaintiffs' argument that, even if the items sought were protected, the SLC had waived the protection by exchanging mediation statements that purportedly disclosed the contents with Ellison and Catz.[31] Instead, the court decided that the parties had an expectation of privacy in a confidential mediation, supported by Delaware's "strong public policy favoring confidentiality in all mediation proceedings."[32]

The Court of Chancery also denied the motion on fiduciary duty grounds. The court rejected the plaintiffs' argument that the court should have applied a heightened review standard because the SLC's assertion of work product protection impeded the plaintiffs' prosecution of the case. As the court explained, the SLC "is composed of fiduciaries for Oracle, who may well have good faith reasons to keep

---

[29] *In re Oracle Corp. Deriv. Litig.*, 2020 WL 3867407, at \*4, \*12 (Del. Ch. July 9, 2020) [hereinafter *July 2020 Opinion*].

[30] *Id.* at \*7–9.

[31] *Id.* at \*9–10.

[32] *Id.* at \*10.

the work product done on the SLC's behalf confidential."[33]  And because the plaintiffs did not plead breach of duty claims against members of the SLC, the court declined to question the SLC's business judgment in withholding the documents.

E.

The Court of Chancery held a ten-day trial in July and August 2022.  In its post-trial opinion, the Court of Chancery concluded that the "transaction was negotiated at arm's length by a fully empowered Special Committee."[34]  The court first determined that, although Ellison would receive a non-ratable benefit from the sale of his stock in NetSuite and was therefore conflicted, he removed himself from the process and left the decision-making to an independent and disinterested special committee.[35]

Next, the court examined whether Ellison exercised general control over the Oracle board despite insulating himself from the process.  The court found that Ellison held less than 30% of Oracle voting power and therefore did not have hard control.  Also, the court found that Ellison did not control Oracle's day-to-day functions nor the board's decisions over the company's operations.  And it found

---

[33] *Id.* at *11.

[34] *Post-Trial Opinion* at *36.

[35] *Id.* at *18.

that the Oracle board "was not afraid to stand opposed to Ellison."[36]   The court concluded that, although "Ellison had clout," he "did not exercise general control."[37]

The Court of Chancery also found that, although Ellison "had the potential to influence the transaction, [he] did not attempt to do so."[38]   After examining the relationship between Ellison and the Special Committee, as well as its negotiations, the court decided that "the Special Committee completed the transaction unmolested by [Ellison's] influence."[39]   The court did not accept the plaintiffs' factual claims that Ellison (1) proposed the transaction; (2) controlled the transaction through his January 27 call with Goldberg; and (3) controlled the transaction through Catz.  The court was also not persuaded that Ellison's potential to control a transaction was so inherently coercive that it rendered him a controlling stockholder.  Accordingly, the court found that Ellison did not exercise transactional control over the acquisition.[40]

Finally, the court addressed the plaintiffs' allegations that Ellison and Catz defrauded the Oracle board and the Special Committee by failing to disclose material

---

[36] *Id.* at *20.

[37] *Id.*

[38] *Id.* at *21.

[39] *Id.*

[40] *Id.* at *25–27.

facts relating to NetSuite's valuation and their interactions with NetSuite.[41] According to the court, whether the standard of review should be elevated from business judgment review under the plaintiffs' "fraud on the board" theory turned on a five-part test: whether (1) the fiduciary was materially interested; (2) the board was inattentive or ineffective; (3) the fiduciary deceived or manipulated the board; (4) the deception was material; and (5) the deception tainted the board's decision-making process.[42] Applying this test, the court found that neither Ellison nor Catz withheld material information or misled the Oracle board and Special Committee.[43] Thus, the Court of Chancery rejected the plaintiffs' disclosure claim and found that neither Ellison nor Catz defrauded the Oracle board and the Special Committee.[44]

## II.

On appeal, the plaintiffs argue first that the Court of Chancery erred by permitting the SLC to withhold its interview memos. According to the plaintiffs, the court: ignored precedent supporting access to non-opinion work product; incorrectly applied business judgment review to the SLC's decision to withhold the interview memos; failed to find waiver after the SLC used the memos or disclosed

---

[41] *Id.* at *27.

[42] *Id.*

[43] *Id.* at *27, *34.

[44] *Id.* at *27, *34.

21

the contents during mediation with Ellison and Catz; and incorrectly found no substantial need or undue hardship by the plaintiffs to use the interview memos for impeachment. We review discovery rulings to determine whether the trial court exceeded its discretion.[45] We review questions of law, including those concerning attorney-client privilege and work product immunity, *de novo*.[46]

## A.

In *Zapata Corp. v. Maldonado*, we held that an SLC's decision to dismiss a derivative lawsuit is not subject to the business judgment rule standard of review.[47] Instead, we applied a higher standard of review because the SLC's motion "is addressed necessarily to the reasonableness of dismissing the complaint prior to trial without any concession of liability on the part of the defendants and without adjudicating the merits of the cause of action itself."[48] To meet its burden, "the SLC must show . . . that no disputed issues of material fact exist about the independence, good faith, and reasonableness of the SLC's investigation and whether the SLC had

---

[45] *Coleman v. PricewaterhouseCoopers, LLC*, 902 A.2d 1102, 1106 (Del. 2006) (reviewing pretrial discovery rulings for abuse of discretion).

[46] *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371 (Del. 2011) (citation omitted).

[47] *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981).

[48] *Diep ex rel. El Pollo Loco Hldgs., Inc. v. Trimaran Pollo P'rs, L.L.C.*, 280 A.3d 133, 151 (Del. 2022) (quoting *Kaplan v. Wyatt*, 484 A.2d 501, 507 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985)).

reasonable bases for its conclusions."[49]  And, as a second discretionary step, the court can apply its own business judgment and decide whether dismissal or settlement is in the corporation's best interests.[50]

The plaintiffs make a two-part argument.  First, according to the plaintiffs, under *Zapata*, they are typically permitted discovery into the SLC's process, which would include access to interview memos; and second, the court should extend *Zapata*'s heightened scrutiny to the SLC's decision to withhold information based on work product protection.

It is true that the Court of Chancery routinely allows limited discovery into an SLC's investigation.[51]  A filing plaintiff uses discovery to evaluate whether material issues of disputed fact exist about an SLC's independence and good faith, the reasonableness of its investigation, and whether the SLC had reasonable bases for its conclusions.[52]  But here, the court is not considering whether it should grant the Oracle SLC's motion to terminate litigation.  Rather, the SLC decided to return the litigation to the plaintiffs.  They accepted.  The plaintiffs neither challenge the

---

[49] *Id.*

[50] *Id.*

[51] *See, e.g.*, *In re Baker Hughes, a GE Co., Deriv. Litig.*, 2023 WL 2967780, at *9 (Del. Ch. Apr. 17, 2023), *aff'd*, 312 A.3d 1154 (Del. 2024) (TABLE); *London v. Tyrrell*, 2010 WL 877528, at *13 (Del. Ch. Mar. 11, 2010); *Sutherland v. Sutherland*, 2007 WL 1954444, at *3–4 (Del. Ch. July 2, 2007).

[52] *Zapata*, 430 A.2d at 788.

independence, good faith, and reasonableness of the SLC's investigation nor whether the SLC should have allowed the plaintiffs to assume control of the litigation. The plaintiffs did not need discovery to evaluate the SLC's decision. *Zapata* review did not apply.

Perhaps recognizing the disconnect between *Zapata* review and the SLC's decision here, the plaintiffs ask us to extend *Zapata* enhanced review to "any SLC determination that impairs [the] prosecution of a corporate claim . . . ."[53] The plaintiffs claim that, by withholding the interview memos, the SLC "did not demonstrate good faith or reasonableness in hindering Plaintiffs' prosecution of Oracle's claims . . . ."[54] As they argue, "Zapata supplies an appropriate framework for testing the SLC's good faith."[55]

We decline the invitation. *Zapata* review is tailored to meet specific concerns in a distinct area of Delaware corporate law – reviewing an SLC's decision to terminate litigation, either through dismissal or settlement.[56] Although the plaintiffs

---

[53] Appellants' Opening Br. at 33 [hereinafter Opening Br.].

[54] *Id.* at 34.

[55] Appellants' Reply Br. at 13 [hereinafter Reply Br.].

[56] *See Baker Hughes*, 2023 WL 2967780, at *10 (observing that *Zapata* addresses "the tension between the board's responsibility under Section 141 to control a corporation's litigation assets and the risk that a conflicted board would seek to terminate a beneficial derivative action"); *London*, 2010 WL 877528, at *11 (discussing *Zapata*'s application in "demand-excused derivative cases in which the board sets up an SLC that investigates whether a derivative suit should proceed and recommends dismissal after its investigation").

24

are correct that they and the SLC are somewhat aligned in their mission – to evaluate and, if warranted, pursue claims against the defendants – we agree with the Court of Chancery that creating another layer of review involving a discovery issue could impinge on the SLC's effectiveness when investigating derivative claims. As the Court of Chancery held, "[a]llowing complete discovery of *all* documents provided to or created by a special litigation committee in situations such as these, as requested by the Subpoenas, could chill candor and access and limit the effectiveness of special litigation committees going forward."[57] Instead of fiduciary review, we conclude that the discovery rules – in particular Rule 26(b)(3) and decisions interpreting those rules when fiduciaries are involved – are better suited to address privilege and work product issues in situations where the SLC has turned over the litigation to the plaintiffs.

B.

The plaintiffs agree that non-opinion work product protection applies to attorney interview summaries, that the mediation between the SLC and defendants was protected by a signed mediation confidentiality agreement, and that the parties conducted the mediation confidentially. Nonetheless, they contend that the SLC waived any non-opinion work product protection when it allegedly shared interview

---

[57] *December 2019 Opinion* at *17.

memoranda or referred to their contents in mediation submissions.[58]  A party can waive work product protection by disclosing work product to an adversary or by "intentionally disclos[ing] or consent[ing] to disclosure of any significant part of the privileged or protected communication or information."[59]  And under some circumstances, a party can waive work product protection by disclosing the documents with "either the intention or practical result that the opposing party may see the documents."[60]  But "[t]here is no waiver of privileged information to third parties if a disclosing party had a reasonable expectancy of privacy when it made an earlier disclosure[,]" and such expectancy of privacy was sanctioned by the law.[61]

The record does not support the plaintiffs' contention that interview memoranda were disclosed during the mediation.  And even if the SLC relied on interview summary content during the mediation, we agree with the Court of Chancery that "[t]he SLC had a strong expectancy of privacy" in the mediation proceedings.[62]  This is consistent with Court of Chancery Rule 174, which provides that "[a]ll communications made in or in connection with the mediation that relate

---

[58] Opening Br. at 36–37.

[59] D.R.E. 510(a).

[60] *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *4 (Del. Ch. Nov. 13, 2002) (quoting *Wolhar v. Gen. Motors Corp.*, 712 A.2d 457, 462–63 (Del. Super. Ct. 1997)).

[61] *Id.*

[62] *July 2020 Opinion* at *10.

to the controversy being mediated, *whether with the mediator or a party during the mediation*, are confidential"[63] and "not subject to discovery."[64] Waiver occurs only when privileged information is disclosed outside the confidential proceedings.[65] According to the record, that was not the case here.

Holding otherwise would deter mediating parties from engaging in frank exchanges to resolve a dispute. As the court explained in *Wilmington Hospitality, L.L.C. v. New Castle County*, "[c]onfidentiality of all communications between the parties or among them and the mediator serves the important public policy of promoting a broad discussion of potential resolutions to the matters being mediated."[66] The court warned that, "[w]ithout the expectation of confidentiality, parties would hesitate to propose compromise solutions out of the concern that they would later be prejudiced by their disclosure."[67]

---

[63] Ct. Ch. R. 174(g)(3) (emphasis added).

[64] *Id.* at 174(h)(1), 174(h)(3).

[65] *Saito*, 2002 WL 31657622, at *3–4.

[66] 788 A.2d 536, 541 (Del. Ch. 2001).

[67] *Id.*; *see also Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 62–63 (Del. Ch. 2005) (observing that Delaware's approach to mediation aligns with that of the Uniform Mediation Act). The Act highlights the importance of confidentiality in instilling public confidence in mediation as a dispute resolution modality, stating that "frank exchange can be achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes." Nat'l Conference of Comm'rs on Unif. State L., Uniform Mediation Act, at Prefatory Note (2003) (citations omitted).

The plaintiffs point to *Ryan v. Gifford* and *Tackett v. State Farm Fire &*
*Casualty Insurance Company*.[68] In *Ryan*, the Court of Chancery found that a special
committee waived its attorney-client privilege when it disclosed its detailed findings
in a meeting attended by the full board of directors, the director defendants (in their
individual capacity), and the director defendants' individual, outside counsel.[69] But
here, the SLC shared the mediation statements with Ellison and Catz as part of
confidential mediation proceedings. And the plaintiffs have not shown that the SLC
shared its detailed findings with Ellison and Catz.[70] Instead, they simply speculated
that the protected materials were disclosed through mediation statements.[71]

*Tackett* is similarly unpersuasive. In *Tackett*, we held that a party waived
attorney-client privilege when it asserted an affirmative defense that implicated
privileged material.[72] To support its argument that routine handling of a claim did
not contribute to the delay in payments to an insured, an insurer alleged

---

[68] *Ryan v. Gifford*, 2008 WL 43699 (Del. Ch. Jan. 2, 2008); *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254 (Del. 1995).

[69] *Ryan*, 2008 WL 43699, at *6; *see also Ryan v. Gifford*, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007) ("On January 18 and 19, 2007, the Special Committee presented its final oral report to Maxim's board of directors. This report appears to be more than a mere acknowledgement of the existence of the report and instead disclosed such details that, for example, attendees were directed to turn in any notes taken during the presentation at the end of the meeting.").

[70] *July 2020 Opinion* at *9.

[71] *Id.*

[72] *Tackett*, 653 A.2d at 259–60.

28

particularized facts that implicitly relied upon communications with its counsel.[73]

Like the special committee's disclosure in *Ryan*, however, the insurer's disclosure in *Tackett* was not made as part of a confidential proceeding. Here, the SLC's disclosure was made as part of confidential mediation proceedings, and the SLC did not waive privilege.

### C.

Finally, the plaintiffs argue that, under Court of Chancery Rule 26(b)(3) and *Garner v. Wolfinbarger*,[74] the SLC's non-opinion work product protection should yield to the plaintiffs' substantial need and undue hardship concerns for the SLC memos.[75] They claim a substantial need for the interview memos for two reasons: first, Hurd passed away before he could be deposed, meaning that the interview memos were needed for his recollection of events; and second, access to the memos would allow the plaintiffs to test whether Catz and Nelson discussed price during their January 2016 phone call when Catz had been instructed not to discuss price.

---

[73] *Id.*

[74] Ct. Ch. R. 26(b)(3); 430 F.2d 1093 (5th Cir. 1970). In *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, we held that the *Garner* factors applied to attorney client privilege only. 95 A.3d 1264, 1280 (Del. 2014). But we also held that these factors overlap with the required showing of "good cause" under Court of Chancery Rule 26(b)(3). *Id.* at 1280–81; *see Zirn v. VLI Corp.*, 621 A.2d 773, 782 (Del. 1993) (applying the *Garner* Factors when analyzing whether a plaintiff has demonstrated "good cause" for the production of work product).

[75] Opening Br. at 38–39. On appeal, the plaintiffs' "substantial need and good cause" argument is limited to non-opinion work product. *Id.*

29

We will not consider the substantial-need argument related to Hurd's interview with the SLC. The plaintiffs did not directly raise the argument below. It is waived on appeal.[76] Whether the plaintiffs demonstrated substantial need or good cause for the interview memos for impeachment related to price discussions is a closer call. On appeal, however, we defer to the Court of Chancery unless it exceeded its discretion.[77]

Under Rule 26(b)(3), to gain access to non-opinion work product, the plaintiffs must show that they have a "substantial need of the materials in the preparation of their case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[78] The Court of Chancery did not exceed its discretion when it found that the plaintiffs:

---

[76] Supr. Ct. R. 8. In its July 2020 Opinion, the Court of Chancery observed that, although "[t]he Lead Plaintiff does note that two interview subjects – Hurd and former Oracle director Hector Garcia-Molina – have since died[,] . . . the Lead Plaintiff has failed to argue substantial need and undue hardship specifically regarding Hurd's and Garcia-Molina's interview memoranda." *July 2020 Opinion* at *7 n.61. Confusingly, the plaintiffs claim that the court's waiver finding "actually reflects that the significance of Hurd's unavailability was argued below." Reply Br. at 5. The Court will generally decline to review questions on appeal "unless they were first fairly presented to the trial court for consideration." *Ravindran v. GLAS Tr. Co. LLC*, 2024 WL 4258889, at *12 (Del. Sept. 23, 2024) (quoting *Russell v. State*, 5 A.3d 622, 627 (Del. 2010)). The plaintiffs are correct that they brought Hurd's passing to the court's attention. They also referred to the difficulty caused by the passing. *See* Reply Br. at 5–7. But we agree with the defendants that the plaintiffs did not present a separate argument relating to substantial need caused by Hurd's death. Referring to his death and potential complications caused by it was not the same as directly raising an argument under Rule 26(b)(3) so that the court understands it is an argument that must be considered and decided.

[77] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010).

[78] Ct. Ch. R. 26(b)(3).

- were provided most of the contemporaneous documents and testimonial evidence generated by the SLC;

- with the exception of Hurd, had the opportunity to depose the witnesses interviewed by the SLC;

- could take witness testimony under oath while the interviews were presumably not and might lead to a mini-trial over what was actually said versus what was recorded in the memos; and

- only speculated that the witness interviews might offer impeachment opportunities.[79]

In addition, we note that the plaintiffs were not without impeachment evidence on what they claim was a central issue in the case – whether Catz and Nelson discussed price during their initial call. For example, the plaintiffs had the September 2016 letter from T. Rowe Price to the independent members of the NetSuite board.[80] The letter alleged that Catz and Nelson discussed a price range of $100–$125 during their initial contact, which, T. Rowe Price alleges, "may have anchored the subsequent

---

[79] *July 2020 Opinion* at *6–9.

[80] In a letter written by NetSuite's largest unaffiliated shareholder, T. Rowe Price, to the independent members of the NetSuite board, T. Rowe Price offered a different view regarding Catz's silence on price:

> In our recent meeting, Mr. Nelson described the initial contact with Oracle as a loose, pre-due-diligence, exploratory conversation where a price range of $100–$125 was discussed. We don't think it's a coincidence that the final agreement ended up very close to the midpoint of that range. We are concerned that this initial conversation . . . may have anchored the subsequent discussions. This anchoring effect . . . may have prevented full price discovery.

A1861 (Letter from T. Rowe Price Assocs., Inc. to the Indep. Members of the Bd. of NetSuite, Inc., Sept. 6, 2016).

discussions" and "prevented full price discovery."[81]  Nonetheless, the Vice Chancellor observed the witnesses at trial, including Catz and Nelson who testified about their conversations,[82] assessed their credibility, and found against the plaintiffs on the issue.[83]  On appeal, we cannot say that the court exceeded its discretion.

### III.

The Court of Chancery applied business judgment review – not entire fairness – to the Oracle/NetSuite transaction.  Although Ellison held a substantial block of Oracle stock and was its visionary co-founder, the court decided that the plaintiffs failed to prove Ellison wielded either general control over Oracle or transaction-specific control or that fiduciaries misled the Special Committee while considering the transaction.[84]  We affirm its decision to apply business judgment review to the transaction.

---

[81] *Id.*

[82] *See* A1115 (Tr. 1062:5–1063:17) (Nelson's testimony regarding the dinner conversation); A1208–09 (Tr. 1436:1–1438:14) (Catz's testimony regarding the dinner conversation).

[83] *Post-Trial Opinion* at *6.

[84] *Id.* at *36.

A.

As a general rule, stockholders do not owe fiduciary duties to the corporation or its stockholders and are free to act in their self-interest.[85] But a stockholder who owns or controls over 50% of a Delaware corporation's stock is presumed to exercise "hard" control and assumes fiduciary duties in certain circumstances.[86] This is because a majority stockholder controls the levers of power within the corporation. As we have said before, "[i]n addition to the election of directors, many of the most fundamental corporate changes also require approval by a majority vote of the stockholders, *e.g.*, mergers, consolidations, sales of all or substantially all of the assets of a corporation and dissolutions."[87]

---

[85] *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("Stockholders in Delaware corporations have a right to control and vote their shares in their own interest. They are limited only by any fiduciary duty owed to other stockholders. It is not objectionable that their motives may be for personal profit, or determined by whim or caprice, so long as they violate no duty owed other shareholders."); *see also Williams v. Geier*, 671 A.2d 1368, 1384 (Del. 1996) (holding that a presumptive controlling block was free to vote their shares as they saw fit as long as the underlying act did not entail "waste, fraud, or manipulative or other inequitable conduct").

[86] *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 507 (Del. 2005) (first citing *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del. 1994); then citing *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989); and then citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984)); *see In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 460 (Del. 2024) ("Controlling stockholders are at times free to act in their own self-interest. But a controlling stockholder is a fiduciary and must be fair to the corporation and its minority stockholders when it stands on both sides of a transaction and receives a non-ratable benefit. In such cases, the controlling stockholder bears the burden of demonstrating 'the most scrupulous inherent fairness of the bargain.'" (citations omitted)).

[87] *Weinstein*, 870 A.2d at 507.

Conversely, a stockholder who owns or controls less than 50% of a corporation's voting power is not presumed to be a controlling stockholder with fiduciary duties.[88] Even so, a minority stockholder can be a controlling stockholder by exercising actual control over the corporation's business and affairs or by exercising actual control over a specific transaction.[89]

The test for actual control by a minority stockholder "is not an easy one to satisfy."[90] The minority stockholder must have "a combination of potent voting power and management control such that the stockholder could be deemed to have effective control of the board without actually owning a majority of stock."[91] To prove actual control over a specific transaction, a plaintiff must prove that the

---

[88] *Id.*; *see Gilbert*, 490 A.2d at 1055 ("[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status.").

[89] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994); *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987); *see also Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018) ("The requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged." (citation omitted)), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE).

[90] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[91] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 307 (Del. 2015); *see also Lynch*, 638 A.2d at 1113 ("[A] shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." (emphasis and citation omitted)).

minority stockholder "exercised actual control over the board of directors during the course of a particular transaction."[92]

The plaintiffs argue that Ellison exercised both general control over Oracle and its board and specific control over the NetSuite transaction. According to the plaintiffs, over time, Ellison held between a 20% to 43% ownership interest in Oracle. Combined with his managerial authority, they claim he had general control over Oracle.[93] They also claim that Ellison's status as a "visionary leader" to promote the NetSuite acquisition and implement his allegedly concealed post-acquisition plans support a general control finding.[94]

This appeal is not, however, from an early-stage dismissal decision. Even though the Court of Chancery denied a pleading-stage dismissal regarding Ellison's controlling stockholder status, the plaintiffs' general and transaction-specific control arguments were fully vetted during a ten-day trial. On appeal, the plaintiffs cite facts and testimony favorable to their arguments. But we do not weigh evidence on

---

[92] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000) (holding that, where the significant stockholder exercises actual control over the transaction, even though not the general affairs of the corporation, she assumes fiduciary duties for purposes of that transaction); *Basho*, 2018 WL 3326693, at *27 ("Broader indicia of effective control . . . play a role in evaluating whether a defendant exercised actual control over a decision."); *In re Rouse Props., Inc.*, 2018 WL 1226015, at *12 (Del. Ch. Mar. 9, 2018) (holding that a minority block holder may be deemed a controlling stockholder if she exercised actual control over the "deciding committee with respect to the challenged transaction" (citation omitted)).

[93] Opening Br. at 44–46.

[94] *Id.*

35

appeal.[95]    Equally important, the plaintiffs have not argued that the Vice Chancellor's contrary factual findings on general and transactional control are clearly wrong.[96]

The "control" question is "a judicial conclusion that is reached after a fact specific analysis."[97]  The Vice Chancellor found the following unchallenged facts to conclude that Ellison, as a minority stockholder, did not exercise actual control over the Oracle board:

- the Oracle board and management were not afraid to disagree with Ellison;

- Ellison neither controlled Oracle's day-to-day functions nor dictated Oracle's operations to the Oracle board;

- Ellison "scrupulously avoided" discussing the transaction with the Special Committee;

- Ellison neither proposed the transaction nor indirectly controlled the merger negotiations through his January 27, 2016, phone call with Goldberg; and

- although Ellison could have controlled the transaction, he did not interfere with or actually exercise control over the transaction.[98]

---

[95] *Arrants v. Home Depot*, 65 A.3d 601, 605 (Del. 2013) ("Appellate courts do not weigh the evidence, determine questions of credibility, or make factual findings." (citation omitted)).

[96] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1043 (Del. 2014) ("We will not overturn the Court of Chancery's factual findings unless they are clearly erroneous." (citation omitted)).

[97] *Weinstein,* 870 A.2d at 506–07.

[98] *Post-Trial Opinion* at *20–27.  The plaintiffs claim that "instead of analyzing Ellison's 'combination of stock voting power and managerial authority,' . . . the Vice Chancellor erroneously looked at each indicia of control in isolation."  Reply Br. at 20.  They argue that the

36

The plaintiffs rely heavily on *In re Cysive, Inc. Shareholders' Litigation*.[99] They argue that, as in *Cysive*, "[i]f the answer respecting Ellison's 'capability' to exercise control is yes, then 'it cannot be that the mere fact that [Ellison] did not interfere with the special committee is a reason to conclude that he is not a controlling stockholder.'"[100]

In *Cysive*, the Court of Chancery found after trial that Cysive's CEO, who proposed a management buyout and controlled a 40% voting block, was not an ordinary CEO, but "a hands-on one, to boot" who was "involved in all aspects of the company's business."[101] He "was the company's creator" and "inspirational force[,]" and had two close family members in executive positions as well as a formerly-employed sister.[102] He could also install a "new slate more to his liking without having to attract much, if any, support from public stockholders."[103]

Court of Chancery should have conducted a "holistic evaluation of the sources of influence" in its analysis on "control." Reply Br. at 24. Although we agree with the plaintiffs that a holistic evaluation is important, the Vice Chancellor did consider all the facts at trial in the aggregate and concluded that, "in light of these facts," this was not a controlled transaction. *Post-Trial Opinion* at *27.

[99] 836 A.2d 531 (Del. Ch. 2003).

[100] Reply Br. at 22 (alteration in original) (quoting *Cysive*, 836 A.2d at 552).

[101] *Cysive*, 836 A.2d at 552.

[102] *Id.*

[103] *Id.*

Here, like in *Cysive*, Ellison was a co-founder and visionary leader of Oracle. And, as the Court of Chancery found, a visionary leader might have, in combination with other factors, the potential to exercise general control over the corporation. But as the court said in *Cysive*, "the question of whether a large block holder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual."[104] Although the controlling stockholder question is not a license to sue on every transaction involving a corporation with a founder/visionary leader, "[i]n cases when the determination of whether control exists turns on disputed facts, it is impossible to determine whether a large block holder is a controlling stockholder until an evidentiary hearing is held."[105] Here, as explained previously, the Court of Chancery found after trial as a factual matter that Ellison, as a 28.8% stockholder, could not exert the type of control found in *Cysive*.[106] The Vice Chancellor came to this conclusion after a ten-day trial, and the factual findings underpinning the conclusion have not been challenged on appeal.[107]

---

[104] *Id.* at 550–51.

[105] *Id.* at 551.

[106] *Post-Trial Opinion* at *26–27.

[107] The plaintiffs also contend that the court "misapplied the legal significance of [its] factual finding that Ellison 'likely had the *potential* to control the transaction at issue.'" Reply Br. at 18 (quoting *Post-Trial Opinion* at *27). They argue that Ellison's potential to control Oracle transactions is the same as the observation in *Cysive* that the minority stockholder could influence transactions "if he so wishes." *See Cysive*, 836 A.2d at 553. As we see it, however, the Vice Chancellor found that Ellison, as a minority stockholder, did not exercise general control over the

We address together the last two issues on appeal – whether the Court of Chancery used the incorrect "test" to decide if entire fairness review should have applied and whether Ellison failed to disclose the material information about his future NetSuite integration plans. The first issue raises a question of law; the second raises a mixed question of fact and law. We review both issues *de novo*.[108]

The Court of Chancery applied a multi-factor test to assess the plaintiffs' "fraud on the board" theory of liability directed at a fiduciary.[109] We find, however, that when it comes to fiduciaries accused of disloyal conduct, the inquiry does not require a multi-factor test. Instead, the court starts from familiar ground and decides whether a conflicted fiduciary violated his fiduciary duty of loyalty. When

---

Oracle board. When discussing the "potential" to control transactions, the court was simply addressing settled law in the transactional control setting that "the *potential* ability to exercise control is not sufficient." *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006). Here, Ellison recused himself and therefore did not exercise actual control over the Oracle/NetSuite transaction. In any event, the potential to control transactions, without more, does not lead ineluctably to controlling stockholder status.

[108] *In re Tesla Motors, Inc. S'holder. Litig.*, 298 A.3d 667, 699 (Del. 2023) ("Our review of the formulation and application of legal principles . . . is plenary and requires no deference." (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 84 (Del. 1995))). *Zirn v. VLI Corp.*, 681 A.2d 1050, 1055 (Del. 1996) ("[I]n an appropriate case, this Court may review *de novo* mixed questions of law and fact, such as determinations of materiality." (citation omitted)).

[109] According to the Court of Chancery, to shift the standard of review under a "fraud on the board" theory, the plaintiffs must prove that (1) the fiduciary was materially interested; (2) the board was inattentive or ineffective; (3) the fiduciary deceived or manipulated the board; (4) the deception was material; and (5) the deception tainted the decision-making process of the board. *Post-Trial Opinion* at *27.

interacting with the Board, the duty of loyalty requires a fiduciary to act in good faith.[110] Good faith requires candor with the board. "[F]iduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations."[111] When a fiduciary withholds material information from the board, engages in deceptive conduct, or otherwise misleads the board, he has failed to act in good faith and therefore acted disloyally.

The plaintiffs fault the court for supposedly requiring the board to be ineffective to sustain a "fraud on the board" claim. Although the board need not be ineffective for a plaintiff to prevail on a breach of the duty of loyalty claim, as explained next, we affirm the Court of Chancery's finding that the plaintiffs failed to prove that Ellison withheld material information from the Committee.

In *Haley*, we held that a fiduciary must disclose information to the board that is "relevant and of a magnitude to be important to directors in carrying out their fiduciary duty of care in decisionmaking."[112] The touchstone of the materiality inquiry is whether a reasonable board or special committee member would have regarded the existence of the undisclosed facts as significant.[113]

---

[110] *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006).

[111] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989).

[112] *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 718 (Del. 2020) (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 n.49 (Del. 2000)).

[113] *Id.* at 724.

The Court of Chancery found that Oracle followed its usual practice in M&A transactions by holding off considering the effects of post-closing plans until after the deal was signed.[114] The plaintiffs are troubled by this factual finding because they believe the Oracle/NetSuite transaction was not a usual transaction.[115] They argue that, as a co-founder and controlling stockholder, Ellison possessed unique insight into both companies and formulated post-closing operating plans that should have been disclosed to the Special Committee.[116] Had Ellison disclosed these important insights, the plaintiffs contend, the Special Committee would have paid closer to $74.58 per share for NetSuite, significantly lower than the $109 per share Oracle ended up paying.[117]

We note with skepticism the argument that Ellison should have made his post-closing views known during the Special Committee's process. If that were so,

---

[114] *Post-Trial Opinion* at *32.

[115] Reply Br. at 32–33.

[116] *Id.*

[117] Opening Br. at 55. The plaintiffs also argue that the Court of Chancery made two erroneous factual findings. First, they allege the court erred by finding that the Special Committee was "apprised of the level of competition between NetSuite and Oracle." Opening Br. at 59 (quoting *Post-Trial Opinion* at *35). But during both the May 5, 2016 diligence meeting attended by James and the May 13, 2016 Special Committee meeting, the participants discussed Oracle's and NetSuite's respective market positioning, competitive landscape, and the two companies' "potentially complementary nature." *Post-Trial Opinion* at *9–11. They also claim that the Vice Chancellor erred by finding that NetSuite had upmarket ambitions and was in the process of implementing Ellison's critiques of its strategy. Opening Br. at 59–60. Although NetSuite did not completely end all upmarket initiatives, NetSuite focused on its verticalization initiatives through Atlas/SuiteSuccess. *See* A1036–37 (Tr. 751:6–754:17).

the plaintiffs likely would have quickly pivoted and claimed that he breached his fiduciary duty by improperly exerting his influence over the Special Committee's work.[118]  In any event, the Court of Chancery found that Ellison's post-acquisition plans were not of a magnitude that the Special Committee would have viewed it as important.[119]  The court held that "[a]lthough there was competition between Oracle and NetSuite at the margins, . . . the two were not significant competitors."[120] Furthermore, at the time of the transaction, NetSuite was in the process of implementing changes to address Ellison's 2015 concerns, which was known to the Special Committee.[121]  Ellison did not want to move NetSuite in a strategic direction that was entirely unforeseeable by the Special Committee or that otherwise changed the fundamental value proposition of the transaction.[122]  On the contrary, he

---

[118] The plaintiffs claim that Ellison could have worked out protocols for engaging with the Special Committee.  Reply Br. at 29–30 (citing *Tesla*, 298 A.3d at 709 n.191).  Even though that might be true, Ellison had no duty to do so, and, in any event, the Special Committee approved its own recusal protocol for the transaction ("Rules of the Road").  *See* B1482 (Email from B. Higgins to S. Catz et al.: RE: Rules of the Road for Project Napa).  It is apparent that both Ellison and the Special Committee were satisfied with Ellison's commitment to recuse himself from the Special Committee's work.

[119] *Post-Trial Opinion* at *32–33.

[120] *Id.* at *29.

[121] *Id.* at *30.

[122] The plaintiffs claim that "Ellison's plan for NetSuite contemplated significant new costs to reach a large number of smaller customers" and "jettisoning NetSuite's up-market sales force and the corresponding projected revenues."  Opening Br. at 57.  But the Special Committee was aware that NetSuite's verticalization and international expansion efforts would require investment post-acquisition.  *See* A867 (Tr. 74:11–75:20); A1151–52 (Tr. 1208:2–1212:22).  And, as discussed

confirmed NetSuite's verticalization strategy, which was already put in motion through SuiteSuccess.[123]

Furthermore, Ellison did not actually control Oracle. He had no ability unilaterally to bring about drastic changes without management and board approval, which, as the Court of Chancery found, "did not appear cowed or overawed" by Ellison.[124] On appeal, we will not overturn the court's conclusion that Ellison's undisclosed post-closing plans for operating NetSuite were immaterial to the Special Committee's evaluation and negotiation of the transaction.

## IV.

The judgment of the Court of Chancery is affirmed.

---

above, NetSuite was already in the process of implementing Ellison's 2015 concerns. *Post-Trial Opinion* at \*30.

[123] *Post-Trial Opinion* at \*30.

[124] *Id.* at \*20.